**MULTI–MEDICAL CONVALESCENT AND NURSING CENTER OF TOWSON, Petitioner,**

v.

**The NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 76–1738.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1977.

Decided Feb. 24, 1977.

---

Jeffrey E. Rockman and Leonard E. Cohen, Baltimore, Md., for petitioner.

Frederick Havard, Atty., N.L.R.B., Washington, D.C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Michael S. Winer, Atty., N.L.R.B., Washington, D.C., on brief), for respondent.

Before WINTER, CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

On the employer's petition to review, and the cross-application of the National Labor Relations Board for enforcement, we conclude, for reasons to be briefly stated, that the Board's order should be enforced.

## I.

■ The Board found that the active manager of the petitioner (Mrs. Burkoff) told the employees that if they voted for the Union she would have to grant pay increases demanded by the Union, that she could not afford to pay such increases, and that she would have no alternative but to lay off some employees. Previously Mrs. Burkoff had told the employees that they would receive raises in pay as the number of patients increased in the nursing center. The Board viewed the statements as the typical "carrot and stick approach" and concluded that the speech was not a "carefully phrased" prediction based on objective fact conveying demonstrably probable consequences beyond respondent's control. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We agree that the employer's expression of views, argument or opinion, fully protected by the First Amendment and by the Act, 29 U.S.C. § 158(c), was not so carefully exercised as to screen out intended implications of "threat of reprisal or force or promise of benefit" in violation of 8(a)(1). 29 U.S.C. § 158(a)(1).

## II.

■ The Board found that as of April 19, 1975, the Union had authorization cards for 20 of the 39 employees and that as of April 23 it had 22 authorization cards. The Company's most serious objection to the authorization cards related to those of Clark and

Owens who were told by Union representatives that their cards were to help the Union get an election. The Board determined that these cards should be counted because the employees were not told that the cards were *solely* for the purpose of obtaining an election and because the cards contained a perfectly clear declaration that the signer designated the Union as bargaining agent. In *Gissel, supra,* a unanimous Supreme Court approved the Board's Cumberland rule, 144 N.L.R.B. 1268 (1963), as applied in one of the cases consolidated under the *Gissel* name and as applied in that case (*General Steel*). 395 U.S. at 584, n. 5, 89 S.Ct. 1918. In approving the Cumberland rule, the Court said:

> [W]e think it sufficient to point out that employees shall be · bound by the clear language of what they sign unless that language is deliberately and clearly cancelled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature.

*Id.* at 606, 89 S.Ct. at 1936.

■ The Board concluded, on substantial and indeed, plenary evidence of unfair labor practices directed toward destruction of the union majority, that the application of the Board's traditional remedies would not serve to eliminate the lingering coercive effect of unfair labor practices. Concluding that a fair new election had been rendered highly improbable by the conduct of the employer, the Board ordered the employer to recognize the Union and to commence bargaining on the basis of the signed authorization cards of a majority of the employees. It is clear that where practices have been engaged in that "have the tendency to undermine majority strength and impede the election processes" the Board has authority to issue a bargaining order. *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940.

> If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Id.* at 614–615, 89 S.Ct. at 1940.

### III.

One aspect of the case gravely concerns us. It is the apparent disposition of the administrative law judge to adhere rigidly to exclusionary rules of evidence and, if at all in doubt, to curtail development of potentially relevant lines of inquiry. This is brinksmanship, and here the administrative law judge very nearly tumbled over the brink. For example, Mrs. Burkoff was asked whether at the time she made her speech to employees the nursing home was making or losing money. The administrative law judge interposed his own objection and refused to permit the witness to answer on the ground that it would be a conclusion and would require testimony of an accountant to determine its truth, and on the further ground that the best evidence would be the books of the corporation. If there were nothing more, we would be inclined to vacate and remand, but later the judge saved himself by indicating he would modify his ruling if counsel was prepared to bring in the books to be examined. In response, counsel ambiguously advised that financial statements are normally year-end and that although he would be able to bring the accountant, he was "not prepared to do that at this moment." Because of this circumstance, and because there is nothing in the record in the nature of objective evidence indicating that the Union had demanded higher wages or would soon do so, we think the administrative law judge skirted the edge of the precipice.

■ We are also concerned that in considering the reasons why Peay was discharged the judge refused to hear evidence that other employees, not affiliated with the Union, were dismissed for a reason allegedly similar to the one assigned by the company with respect to this union adherent. After Mrs. Burkoff had been allowed to testify that she had terminated "about four" employees for insubordination, she

was asked whether she could identify them. Thereafter ensued a colloquy between the administrative law judge and company counsel. The judge indicated that he would not permit going into the circumstances of the discharge of other employees "at length" and having them called as witnesses, and also indicated that Mrs. Burkoff's statement that "four employees were terminated for insubordination" would stand. Counsel for the company apparently acquiesced in the ruling and made no further proffer. Ex.App. 100. That sort of evidence goes to whether the company departed from its customary practice in discharging union adherents, which goes to the question of invidious motivation. The evidence supporting the Board's decision that Peay's discharge was for union activity was very strong. There was, indeed, so much of it that the administrative law judge summarized the factors he took into account and the summary comes to one-half page of his decision.[1] Because the evidence is very strong and because of counsel's apparent acquiescence to the ruling cutting off further development of the facts with respect to the alleged termination for insubordination of other employees, we think the error does not invalidate the proceedings. But it would have been better practice for the administrative law judge to have permitted testimony, albeit briefly, as to the conduct of the other employees said to have occasioned discharge for insubordination.

In a nonjury trial, whether in the district court or before an administrative law judge, little harm can result from the reception of evidence that could perhaps be excluded. This is so because the judge, trial or administrative, is presumably competent to screen out and disregard what he thinks he should not have heard, or to discount it for practical and sensible reasons. On the other hand, to exclude that which is competent and relevant by mechanistic application of an exclusionary rule is exceedingly dangerous to the administrative or trial process and may well result in vacating the judgment or order on procedural due process grounds.

It has long been settled[2] that an appellate court will not reverse a judgment in a nonjury case because of the admission of incompetent evidence, unless all of the competent evidence is insufficient to support the judgment or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would not otherwise have been made. *Builders Steel Co. v. Commissioner of Internal Revenue,* 179 F.2d 377 (8th Cir. 1950). See 2B W. Barron & A. Holtzoff, *Federal Practice and Procedure* § 972 (Wright ed. 1961).

---

1. The following is an excerpt from the administrative law judge's "Conclusions":

   My decision on the question of Peay's discharge is based, *inter alia,* upon the following considerations in summary: (1) Peay's unguarded leadership activities on behalf of the Union. (2) Burkoff's hostile reaction upon finding Peay attended the Board representation hearing on April 21, and her expressed belief that Peay was a paid union organizer. (3) Burkoff's use of Connor as an espionage agent, and his invasion and violation of Peay's confidence in obtaining and reporting to Burkoff on Peay's union conduct, including the remark in question critical of Burkoff. (4) The fact that on April 29 Connor was engaged with Peay in a two-party conversation, purportedly overheard from a distance by two employees who were not called to testify. (5) Connor's written report to Burkoff on April 29, pointing to Peay as a "rabble-rouser" and as a dedicated proponent of the Union,—while quoting Peay as stating

   she had heard Burkoff is a crook. (6) The essential nature of Peay's remark regarding Burkoff. It was made in limited reference to the reliability of the Union's financial statements given to Connor by Burkoff for campaign propaganda. It appears as an offhand comment by an obviously unsophisticated domestic-type worker. It was not articulated for general circulation and, in my opinion, was not uttered with intended or understood malice against Burkoff personally. (7) Burkoff decided summarily to discharge Peay before confronting her,—Connor's protests notwithstanding that he did not intend such a result and that it was wrong. And Connor was told he had to back her up; "administrators have to stick together."
   Jt. App. 49.

2. Innumerable decisions are collected in West's *Modern Federal Practice Digest* under the ⊗⇒ "Courts" 406.6(8)(i), *Cases tried without jury,* 15 Modern Federal Practice Digest 466.

Professor Wright tells us that "[t]he attitude now governing has been strongly stated by Judge Sanborn: 'In the trial of a nonjury case, it is virtually impossible for a trial judge to commit reversible error by receiving incompetent evidence, whether objected to or not.'" 2B W. Barron & A. Holtzoff, *supra,* at 268.

The appellate courts have taken a similarly critical view of exclusionary rulings by administrative agencies. *Samuel H. Moss, Inc. v. FTC,* 148 F.2d 378, 380 (2d Cir.), *cert. denied,* 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 438 (1945). Thus, we strongly advise administrative law judges: if in doubt, let it in.

### IV.

We have carefully considered the other issues presented by the employer and find them without merit.

■ We hold that substantial evidence on the record as a whole supports the Board's findings that the nursing home violated § 8(a)(1) by threatening employees with layoffs if they voted for the Union, and by coercively interrogating employees about union activities and conducting an espionage campaign. We hold that the nursing home violated §§ 8(a)(3) and (1) of the Act by discharging employees Wilma Peay and Vera Owens. For the reasons stated, we also hold that the nursing home violated §§ 8(a)(5) and (1) of the Act by refusing to recognize the Union as majority representative of its employees and that a bargaining order was not inappropriate to effectuate the policies of the Act.

*ORDER ENFORCED.*