NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MAIDSVILLE COAL COMPANY, INC., Respondent.

No. 81–2155.

United States Court of Appeals, Fourth Circuit.

Argued June 11, 1982.

Decided Nov. 15, 1982.

Rehearing and Rehearing En Banc Granted Feb. 16, 1983.

David S. Fishback, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief), for petitioner.

Robert M. Steptoe, Jr., Clarksburg, W. Va. (C. David Morrison, Clarksburg, W. Va., on brief), for respondent.

Kenneth J. Yablonski, Lawrence R. Chaban, Yablonski, King, Costello & Leckie, Washington, D.C., on brief, for amicus curiae.

Before BRYAN, Senior Circuit Judge, and SPROUSE and CHAPMAN, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Adjudging respondent employer guilty of abridging the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1976), in multiple respects, the National Labor Relations Board (Board or NLRB) now prays this Court to enforce the Board's Order of September 1, 1981, requiring, *inter alia,* Maidsville Coal Company, the employer, to bargain with the United Mine Workers of America (Mine Workers). For the reasons which follow, we decline enforcement and remand the cause to the Board for further proceedings consistent with this opinion.

I

In April 1979, the Mine Workers began an organizing campaign at the employer's tipple in Maidsville, West Virginia. Representatives of the union circulated authorization cards to production and maintenance employees and, by April 11, the signatures of five employees had been obtained. Afterwards, this number was found by the Administrative Law Judge, as well as the Board, to constitute a majority. Formal demand for recognition by the Mine Workers was made April 19.

According to the ALJ's findings, confirmed by the NLRB, the employer ran afoul of the Act's strictures on several occasions during the organizational campaign. First, it gave all of its employees salary increases during the campaign, in violation of § 8(a)(1) of the Act. Second, on April 13 it wrongfully terminated four employees upon suspicion that they were active in the

union effort. This disregard of § 8(a)(3) was mitigated ten days later by the employer voluntarily rehiring and paying back wages to each of the four workers. Third, the employer was found to have constructively discharged Richard Heller, the tipple's weighmaster, nearly a month afterwards, on May 21, 1979. There were sundry other violations of § 8(a)(1) found by the ALJ[1] as well as a violation of § 8(a)(5) on account of the employer's refusal to bargain with the Mine Workers.

Between April 19, when the employer's president said he first learned he could not fire employees for union activity, and April 23, the employer sought to appease the employees by a) rehiring with full back pay the fired workers, b) obtaining from employees a list of grievances, and c) scheduling a meeting with all employees for April 23. At this meeting, the president stated that he could not discuss bargaining in light of the Mine Workers' action in demanding recognition and in filing the first of several unfair labor practice charges. Discharged employee, Heller, asked the management representatives to leave the room so the employees could discuss the situation among themselves. At this point, Heller apprised his colleagues of conversations with the president and indicated that the latter had offered to rectify all their complaints[2] if the union was rejected. Five employees, including one—Kenneth Roberson—who had earlier signed a union authorization card, agreed to this resolve and thereupon signed a notarized statement to such effect. The four employees who were dismissed on April 13, however, declined to accede to this agreement. In any event, the employer apparently assented to the conditions and nothing further was done by the employees relating to the union.

The union, of course, continued to press its contention that the employer's conduct throughout the ill-fated organizational campaign contravened the Act. The ALJ saw the employer as offending § 8(a)(1) by unlawfully interrogating employees and by threats of discharge and reprisals, of § 8(a)(3) by illegally firing the four employees on April 13, and later effectively discharging Heller, and of § 8(a)(5) by refusing to bargain with the union on and after April 19.

Besides requiring Maidsville to refrain from violating the Act, rehire the fired workers with back pay and other employment rights, and acknowledge its transgressions through the posting of the usual notice, the ALJ recommended and the Board ordered the employer to bargain with the Mine Workers. This portion of the decision was grounded on the finding of a card majority prior to the commission of the unfair labor practices and the conclusion that a fair election could not be obtained in the future.

Enforcement of this Order is now sought. Employer resists, principally protesting that the union never had a card majority because a) Heller was improperly counted as an employee and b) one Jeffrey Freeman was mistakenly classified as a supervisor. Further, the employer contends that the Board's decision that unlawful across-the-board wage increases were granted is not substantiated by the evidence and, also, that neither the ALJ nor the Board made sufficiently detailed findings of fact to authorize a bargaining order.

II

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Court identified three situations where consideration might be given to the appropriateness of a bargaining order. First, it may be suitable where the employer is adjudged to have committed "outrageous" or "pervasive" unfair labor practices, regardless of whether the union ever has garnered major-

---

1. Included among these infractions were unlawful interrogations of employees about their union activities and sympathies, and threats of discharge or reprisal.

2. The grievances included a demand that James Casino be removed as supervisor, that all fired employees be rehired with back pay, that a retirement plan be devised, and that wages be increased.

ity sentiment. Infractions of this degree are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies with the result that a fair and reliable election cannot be had." *Id.* at 614, 89 S.Ct. at 1940, *quoting NLRB v. Logan Packing Co.,* 386 F.2d 562, 570 (4th Cir.1967). Second, the Court opined that a bargaining order could be issued by the Board to remedy less outrageous instances of employer misconduct which still tend to subvert the election process. In determining whether, in its discretion, the Board should issue an order in this setting, the Supreme Court instructed the Board to give thought to whether the union once had a card majority which apparently had been dissipated by the unfair labor practices, the extensiveness of past employer misconduct, their effect on election conditions, and the likelihood of their recurrence in the future. 395 U.S. at 614, 89 S.Ct. at 1940. Finally, the Court remarked that there was yet a third category of incidents marked by minor, relatively insignificant disobedience. Noting that these trifling faults had an insubstantial effect on elections, the primary mechanism for evaluating employee support for a proposed collective bargaining agent, the Court held that orders to bargain in this context would be impermissible.

The Board now insists that the bargaining order is justifiable as a remedy imposed, pursuant to the sound exercise of the agency's discretion, for the second category of unfair labor practices. Insisting that the record, taken as a whole, supplies substantial evidence for this decision, the NLRB demands enforcement.

█ The employer resists, first by seeking to undercut the essential predicate for a *Gissel* bargaining order in the so-called category II case. It maintains that the Mine Workers actually never had a card majority because Jeff Freeman was an

"employee" and not a "supervisor" and/or because Richard Heller was a "supervisor" and not an "employee." Nevertheless, we believe the Board's resolution of these factual matters is underpinned, however, by sufficient evidence. Thus we decline to disturb them.[3]

█ As another ground for relief, the employer maintains that the Board's bargaining order is defective because its promulgation does not meet the prerequisites of this Circuit expounded in *NLRB v. Appletree Chevrolet, Inc.,* 608 F.2d 988 (4th Cir.1979). There, we said the Board must advance specific, detailed reasons upholding its conclusions that an election will not adequately reflect employee preferences and that traditional remedies (e.g., cease and desist orders) are unlikely to erase any hint of coercion occasioned by the employer's unfair labor practices. We agree with the employer.

In *Appletree Chevrolet,* the Board's petition for enforcement was not allowed when review of its proceedings made plain that the Board did little more than cite *Gissel* as the basis for its bargaining order. Writing for this Court, Judge Russell commented that "[b]oth [the ALJ and the Board] seem to have proceeded upon the erroneous assumption that a finding of unfair labor practices automatically engendered a coercive atmosphere that would support a bargaining order." *Id.* at 1000. He observed that in making specific findings, "the Board must ... 'assess the possibility of holding a fair election in terms of any continuing effect of misconduct, and the potential effectiveness of ordinary remedies,' [and] should consider whether the respondent's conduct has dissipated the Union's majority and whether the employer is likely to 'ignore the Board's cease and desist order.'" *Id.* (footnotes omitted)

---

**3.** Similarly, the employer's challenge to the NLRB's finding that across-the-board wage increases were granted, in violation of § 8(a)(1), must fail. While the employer may be able to point to probative evidence which, if believed, could sustain its position, the Board is equally capable of defending its judgment through reference to the record. Under these circumstances, the Act, *see* 29 U.S.C. § 160(e) (1976), clearly requires this Court to give credence to the Board's findings.

Review of the ALJ's Findings and Conclusions here, as well as the Board's Decision, reveals a failure, comparable to that identified in *Appletree Chevrolet,* to make the specific findings mandated by both *Gissel* and *Appletree Chevrolet.* In the ALJ's 77-page decision, the only "findings" relevant to the issuance of a bargaining order are contained in a conclusory footnote.[4] Such talismanic invocations, of course, are insufficient in this Circuit to sustain a bargaining order.

Perhaps mindful of this fact, the Board, in confirming the ALJ's recommended decision, made a belated attempt to comply with our exactions. Regrettably, its attempt shares all the deficiencies of the ALJ's decision. Rather than actually analyzing the facts with a view toward determining whether a fair election could be had, the Board recites, without more, the Court's explanation of what kind of showing is necessary for the issuance of a bargaining order. This is not enough.

■ With apparently necessary repetition, we reiterate that elections are the preferred measure of employee sentiment under the Act. Still, there are cases where it is not possible to hold a fair election. But before a bargaining order may issue, the Board must demonstrate, with particularity, why traditional remedies probably will not protect employees' rights under § 7 of the Act. Since it has not here done so, enforcement is disallowed and remand is ordered for reconsideration in light of *Appletree Chevrolet.*[5]

4. The ALJ wrote:

I specifically conclude and find the unfair labor practices committed by Employer were so pervasive and extensive that the possibility of erasing their effects on the employees and ensuring a fair election by the use of traditional remedies is slight. With employees being so conditioned, I find that in this case, employee sentiment, as expressed by the authorization cards is best protected by a bargaining order. *NLRB v. Gissel Packing Co., Inc.,* 395 U.S. 575 [89 S.Ct. 1918, 23 L.Ed.2d 547] (1969); Staats and Staats, Inc., 254 NLRB No. 105 (1981).

## III

Prior to the argument of this appeal, the employer moved to supplement the record on appeal with its president's affidavit. The affiant made known that the composition of the employer's workforce has changed dramatically since the alleged infractions in 1979. The point of this submission is to persuade us that whatever the merits of a bargaining order in 1979, circumstances have changed so radically and undeniably that it would be ill-advised to uphold the Board's decree today.

With one Judge dissenting, we tentatively granted the employer's motion to supplement, but left to the Board the opportunity to challenge this addition at oral argument. The Board instantly opposed such an informative endeavor. Instead, it mechanically insisted that it had properly considered the relevant evidence and that its decision should be reviewed by this Court only on the basis of the record evidence available to the Board.

■ The Board, of course, is correct in averring that an appellate court, with very rare exceptions, must confine its review to that which comprised the record in the trial court or administrative agency. Therefore, we do not now pass upon the evidence now made known by the employer. Since a remand is necessary, however, and to save the parties from the probability of a duplication of this litigation, we think that the employer's affidavit ought to be countenanced by the Board, together with such other evidence as the parties may present concerning the issuance of a bargaining order. *See* 29 U.S.C. § 160(e) (1976).[6]

Appendix at 72.

5. In conducting this inquiry, we further admonish the Board to consider our additional comments on the necessary analysis in *Appletree II. See NLRB v. Appletree Chevrolet, Inc.,* 671 F.2d 838 (1982).

6. In pertinent part, this provision states that upon a proper showing, we "may order ... additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record."

The petition for enforcement is denied and the cause is remanded to the National Labor Relations Board for further proceedings consistent with this opinion.

*It Is So Ordered.*

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent.

I agree with the majority that substantial evidence requires affirmance of the Board's findings of unfair labor practices, that Freeman was a supervisor, and that Heller was an employee and appropriately counted as a member of the bargaining unit. The reason for the majority's decision to deny enforcement and to remand is its conclusion that the Board did not sufficiently articulate its reasons for issuing an order to bargain. In my view the expression of the Board's reasoning more than satisfies the *Appletree* standard of particularity, and the bargaining order should be enforced.

In *Appletree I,* Judge Russell correctly observed: "It is only because the misconduct of the employer has so dissipated the union majority that a fair expression of employee sentiment, uncoerced by the employer's improper conduct, cannot be secured by the traditional procedure that, in this second class of cases, a bargaining order may issue." *N.L.R.B. v. Appletree Chevrolet, Inc.,* 608 F.2d 988, 996 (4th Cir. 1979).

The court in *Appletree I* refused to enforce the portion of the Board's order requiring bargaining because the court felt that the Board failed ... "to make anything more than the most cursory findings on the impact of the 8(a)(1) violations on the possibility of a fair election...." and that the Board had "... proceeded upon the erroneous assumption that a finding of unfair labor practices automatically engendered a coercive atmosphere that would support a bargaining order." *Id.* at 1000.

In its opinion, in the case *sub judice,* the Board explained:

> [T]he evidence establishes that, at the outset of its employees' union organizational activities, the Employer commenced a campaign designed to undermine and erode the Union's majority support among its employees by discharging four identified union supporters on the sole basis of these employees' union sentiments. At the same time, the Employer violated the Act by interrogating employees concerning their union activities and sentiments; by granting wage increases; by making various promises of improved working conditions and benefits in order to dissuade employees from supporting the Union; and by threatening employees with discharge, layoff, and other reprisals, including the cessation or reduction of operations, if they continued to engage in activities on behalf of the Union. Thereafter, the Employer enlisted the aid of a third party to threaten an employee with physical harm if he continued to support the Union.

> Under these circumstances, including the small size of the employee complement in question and the substantial percentage of the work force subjected to the Employer's unlawful terminations and other unfair labor practices, we find that a bargaining order is necessary and appropriate in order to protect the majority sentiment expressed through the authorization cards and to otherwise remedy the violations committed.

How could the Board, attempting to comply with *Appletree,* more completely explain the Board's view of the evidence as supporting a conclusion that the misconduct of the employer has so dissipated the union majority that a fair expression of employee sentiment, uncoerced by the employer's improper conduct, could not be secured by the traditional procedures? The simple answer is that the Board could not. The Board's opinion fully satisfied *Appletree* 's articulation standard—fully summarized the evidence and displayed the Board's reasoning supporting its conclusion that an election would likely be tainted by the unfair practices.

Moreover, the foregoing summary and statement of reasoning were not derived or expressed in a vacuum. The Board had

adopted the ALJ's findings of fact (detailed hereafter). These facts so clearly depict the nature and effect of the unfair practices that requiring summarization by the ALJ or the Board in fact adds very little. Since, however, we are to compel a summary by the Board of its view of the evidence, that requirement should be reasonably flexible in a case such as this, where a detailed compilation of facts found at trial renders the application of legal principles to those facts a simple task. The evidence here speaks so loudly of pervasive and egregious unfair labor practices, that our rule requiring the factfinder to restate its understanding of the evidence should not force the Board to redundancy, in a case where all the substantive *Gissel* criteria are obviously satisfied.[1]

Particularly illustrative of the egregious violations in this case was an incident involving the employer's threat of physical harm to an employee. The employee, Richard Heller, had on repeated occasions been verbally harassed about his pro-union sentiments by the employer, to the point of physical illness. Heller was working in the scalehouse with a person from a coal testing lab when he saw his employer, John Petitte, outside talking with two men he did not know. One of those men—who was about six feet tall, 250 pounds, with "great big arms and a great big neck, like a football player"—then came into the scalehouse, locked the door behind him, walked up to Heller, pointed his finger in Heller's face, and said, "What's this I hear about a labor problem down here?" Heller backed into a corner and replied that he did not know what the stranger was talking about. Nevertheless, the man kept shaking his finger in Heller's face and said, "I'm going to

tell you something, I don't want to hear no more about a labor problem down here. The Petittes don't want a union down here, so I better not hear no more about it." The man then pointed to the lab worker and said that also went for him. Heller said that the lab worker was from another company and not involved. At that point, the company President, John Petitte (hereinafter "Petitte"), knocked on the door and was let in. Petitte asked what the matter was and told Heller, "You look like you seen a ghost." Heller replied, "I don't appreciate what you just had this guy do to me." Petitte answered, "I was just razzing you a little bit, joking around with you." Petitte told Heller not to let it get to him.

This incident occurred at the end of a two-month period during which scarcely a day passed without illegal employer harassment, promises, bribes, threats, interrogation and discharges. The following chronological review of the events of that month, as found by the ALJ and expressed by the Board, illustrates the inutility of requiring the Board to explain at greater length its reasoning.

In May, 1979, United Mine Workers of America (hereinafter "Union") organizer Bonnett contacted Company supervisor Freeman and asked Freeman to give him the names and addresses of the Company's employees. Freeman did not provide Bonnett with such a list, but Bonnett and Morris, another Union organizer, proceeded by visiting and talking to employees at their homes, at bars, and at churches. In the course of their efforts, they reached all nine of the Company's production and maintenance employees and received favorable responses from six of them.

---

1. *See, e.g., Multi-Medical Convalescent and Nursing Center v. NLRB,* 550 F.2d 974 (4th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977), (where a bargaining order in response to less egregious and pervasive unfair labor practices than are present here was approved): "It is clear that where practices have been engaged in that 'have the *tendency* to undermine majority strength and impede the election process' the Board has authority to issue a bargaining order." *Id.* at 976, *quoting*

*NLRB v. Gissel Packing Co.,* 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969). Moreover, " 'If the Board finds that the possibility of *erasing* the effects of past practices and of *ensuring* a fair election . . . is slight and that employee sentiment once expressed through cards would, *on balance,* be *better* protected by a bargaining order, then such an order should issue.' " *Multi-Medical* at 976, *quoting Gissel,* 395 U.S. at 614–15, 89 S.Ct. at 1940. (emphasis added).

In late March, supervisor Freeman asked employee Trippitt if he had signed a Union card. When Trippitt replied that he had not, Freeman said that there would be no union, because the Petittes would run the place themselves to avoid it. Sometime in early April, prior to April 9, Freeman told employee Bowman that he had informed Superintendent Guseman that a Union organizer was talking to the men.

On April 4, Guseman granted hourly wage increases of 50 cents to Freeman and employee Roberson, and 25 cents to employee Tennant. These raises were to be effective April 4. On April 9, Bowman signed a union authorization card. Trippitt, Roberson, Heller, and Eddy signed Union authorization cards on April 10.

During the afternoon shift on April 10, Petitte informed Bowman and Trippitt that they were being granted a 50-cent per-hour wage increase, to be effective April 18. Late that night, Freeman told Bowman and Trippitt that they should forget about the Union and that the Petittes would run the operation themselves rather than deal with the Union.

The next day April 11, Petitte informed employee Eddy that he was being granted a 25-cent per-hour wage increase, to be effective April 18, and that, if things went well, Eddy would receive another raise in six to eight months. Similar raises were also given to employees Ingersoll, Elliott, and Fain.

On April 12, Petitte approached Bowman while at work and asked him if Union organizer Morris had been to his home. When Bowman said, "Yes," Petitte asked him what he had told Morris. Bowman replied that he had told Morris to "get the hell out of my house." Petitte then told Bowman that he would get another raise in the summer if work picked up. In the course of this discussion, Petitte also told Bowman that he could not afford the Union and that, if it came in, he would just lay off the workers and run the place himself. Finally, Petitte told Bowman to keep his father away from the Company because he believed that the Union mine where Bowman's father worked was the source of the Company's Union problem.

On April 12, Freeman informed company vice-president Jasper Petitte that Bowman had signed a Union card. John and Jasper Petitte then discussed the Union situation, and that afternoon (April 12), the Company decided to terminate the four employees it believed to be Union adherents—Bowman, Trippitt, Eddy, and Heller—this to forestall unionization. The four were immediately notified of their termination.

On Thursday, April 19, Union representatives Morris and Bonnett came to Petitte's office and requested recognition of and bargaining with the Union as the majority representative of the Company's production and maintenance employees; Petitte declined. Later that day, Petitte called his lawyer, who told Petitte that while he did not have to recognize the Union, the discharge of the four men was unlawful and that they should be hired back to avoid extensive backpay liability.

On Friday morning, April 20, Petitte drove to Heller's home, where he found both Heller and Eddy. After telling Heller and Eddy, "I don't know what I'm going to do with you guys," Petitte offered them reinstatement. Petitte further said he would pay them $8.00 per hour if they came back to work. Heller asserted that most of the employees felt that the foreman, Casino, should be relieved and mentioned other grievances; Eddy said that the Company ought to have a retirement plan. Petitte wrote these items down, but stated that he could not afford the Union and that, if the Union came in, he would cut back the workforce and would probably lay off both Heller and Eddy. On the other hand, Petitte said he would get working on a pension plan right away and would grant a pay increase, vacation pay, and paid holidays as soon as the Union was voted out. Finally, Petitte asked Heller to serve as spokesman for the employees; Heller agreed. Heller and Eddy agreed to return to work on Monday.

The next day, Saturday, April 21, Petitte again visited Heller's home. This time he

reported on the progress he had made in setting up a retirement system and told Heller there would be a meeting at 3:00 p.m. Monday, to discuss retirement and the other proposals made the day before.

On Sunday, April 22, Petitte sought out Charles Lazzell, a Petitte family friend and neighbor. Petitte told Lazzell what had happened. Lazzell suggested that Petitte contact an attorney specializing in labor problems and further told Petitte that he could not fire anyone for Union activities and that he should not get involved in direct negotiation with the employees.

The next morning, April 23, Freeman, pursuant to Petitte's direction, contacted Bowman and asked him to return to work. Freeman stated that the men should forget about the Union and that raises were in the offing.

On April 23, following a conference with Lazzell, Petitte informed Heller that, due to legal constraints, Petitte could not bargain about the April 20 proposals with the men and that he could not promise anything to them. Heller asked if he could meet with the men. Lazzell, speaking for the Company at this point, said that would be permissible. Heller then asked if the employees could discuss the proposals among themselves and then present them to Petitte for him to "agree to it or not." Lazzell, not knowing whether this would be a legally permissible course of action for the Company, told Heller that if he brought it up, the Company would respond at that time.

Heller, Eddy, Trippitt, and Bowman met at Bowman's home that afternoon to discuss their position and then returned to the plant for the scheduled 3:00 p.m. meeting. Just before the meeting began, however, Heller was informed by Petitte that he had just discovered that he could not lawfully grant any proposal coming from the employees because he was prohibited from dealing with them directly on such matters.

The meeting was attended by Petitte, Guseman, Freeman, Lazzell, and all the non-office employees except Elliott, who was absent that day. Petitte began the meeting by introducing Lazzell, who ex-plained that because of a representation election petition filed with the National Labor Relations Board, the Company could not negotiate with, or make promises to, the employees because such promises would be "illegal." Heller asked if the employees could have a meeting; Lazzell said they could, but management would have to leave. Heller asked the management representatives to leave and, except for Freeman, they did.

Heller then presented the proposals that Petitte had earlier agreed to if the employees did not bring in the Union. Next, he read a list of proposals that the employees should present to the Company. At that point, Freeman suggested that they vote on the list; they did so, and all voted in favor. Freeman then brought in the company secretary, who was also a notary public, and had her type and notarize a document which stated that the employees had voted unanimously in favor of the proposals. Then Freeman told the employees that they would vote on the Union and that, if the Union was voted out, the proposals would go into effect that day. Heller resisted, stating that any such decision should be made at the election. Freeman pressed the point and called for a vote by a show of hands to see who wanted the Union out. Five voted to dispense with the Union. The four remaining employees present—Heller, Eddy, Bowman, and Trippitt—abstained on the ground that this was not the proper way to resolve the issue. Freeman again brought in the secretary, who prepared a notarized document, which was signed by the five who voted against the Union. After the meeting ended, the two notarized documents were given to Petitte, and the four recalled employees received checks to cover backpay.

The next day, April 24, Petitte came by the scalehouse and asked Heller how the men now felt about the Union, since the Company could not grant the proposals because of the Union. Heller said he was not sure.

The following day, Wednesday, April 25, Petitte came by the scalehouse and asked

Heller how he was doing. Heller answered that he was not doing well, because he was nervous about the Union situation. Petitte asked how the employees felt about the Union; Heller said that he did not know— that he was not sure. Petitte then asked if Heller thought the employees would vote the Union in or out; Heller again answered that he did not know—that he was not sure. Heller then told Petitte he was sick and asked to go home. Petitte told him to wait and went to get Lazzell. Lazzell came into the scalehouse and told Heller he could leave. Heller said he would let them know how he felt on Friday, and stated, in response to a question, that he was not quitting.

Heller contacted Petitte on Friday, April 27, and told Petitte that he had gone to see a doctor, who told him that "his nerves and his job were getting to him" and that he should take two weeks off. Heller consequently requested two weeks off, which Petitte granted, without pay.

Heller returned to work several days later, on Wednesday, May 2. That morning, Petitte came by the scalehouse and told Heller that he was mad because every time he talked to employees about the Union, "outsiders" would find out and he would get in more trouble. Petitte also complained that every time he asked employees if they were talking with anyone about the Union, they would not give an answer. Thereafter, Petitte asked Heller almost every day what the men thought about the Union and whether they were going to vote it in or out. Petitte also repeatedly told Heller that he could not afford the Union and that, if the Union came in, many employees would lose their jobs. When Heller complained to Petitte that this continuing questioning about the Union made him nervous, Petitte's response was that the Union also upset him.

Around May 3, Heller became so ill in the scalehouse that he had to go to the restroom. Later that day, Heller telephoned Petitte and told him he wished to quit. Petitte resisted and asked Heller to come to the office. Heller did so and told Petitte

that the greatest cause of his upset was the continued interrogation about the Union.

Heller returned to work on Friday, May 4. Beginning Monday, May 7, Petitte approached Heller each day and told him that the Company could not afford the Union and that, if the Union came in, he would probably lose his job. This went on all week. During the week of Monday, May 14, Petitte came to Heller and asked him if the men had changed their minds about the Union and if Heller knew how they were going to vote. Heller got "nervous every time [he saw Petitte] coming." On Thursday, May 17, Heller was physically threatened as hereinbefore described.

Considering the foregoing facts, is it any way unclear why and how the Board concluded that the unfair labor practices were so serious and pervasive that they would probably affect an election? We must remember that the underpinning of *Gissel* and *Appletree* is the importance of an assessment by the Board of the immediate and residual coercive effects of the unfair practices, in order to determine the likelihood that an election would be affected by the unfair labor practices. 395 U.S. at 579, 89 S.Ct. at 1922; 608 F.2d at 1000. The question of whether or not an election would likely be affected by unfair labor practices ultimately must turn on the circumstances of the unit and the nature of the unfair labor practices, which factors in this case were clearly presented with great particularity, and evaluated by the Board. Thus, the *Appletree* standard is satisfied.

There is a final point on which I differ from my panel colleagues. Two weeks prior to oral argument on this appeal, Maidsville moved to supplement the appellate record with its president's affidavit relating information concerning the then current composition of its work force. This information had not been developed during the hearings. The majority opinion states that the motion was "tentatively" granted. I believe this to be an unwarranted practice. Regardless of how the procedure is characterized, the majority effectively considered the information and has ordered the Board

to consider it on remand. Approving this procedure could well expand the appellate process to include interminable affidavits bearing information tardily conceived as relevant by parties to the litigation. This has been universally disapproved. *See L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1353 (9th Cir.1980); *J.P. Stevens & Co., Inc. v. NLRB,* 441 F.2d 514, 525 n. 16 (5th Cir.1971), *cert. denied,* 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59; *NLRB v. L.B. Foster Co.,* 418 F.2d 1 (9th Cir.1969); *cert. denied,* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398; *General Steel Products, Inc. v. NLRB,* 445 F.2d 1350, 1361 (4th Cir.1971) (Winter, J., dissenting). The majority recognizes "that an appellate court, with rare exceptions, must confine its review to that which comprised the record in the trial court or administrative agency." The majority has not, however, demonstrated a "rarity" in this case calling for an exception, and this decision provides no guidance to the characteristics of such a "rarity."