**Willie B. HACKETT,
Plaintiff-Appellant,**

v.

**The HOUSING AUTHORITY OF the CITY OF SAN ANTONIO, A Political and Corporate Body, Defendant-Appellee.**

No. 84–1057.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1985.

Rehearing Denied March 7, 1985.

Wiley, Garwood, Stolhandske & Simmons, James E. Conley, III, Per Hardy, San Antonio, Tex., for plaintiff-appellant.

Jack A. Efron, San Antonio, Tex., for defendant-appellee.

Before GEE, WILLIAMS and JOLLY, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Willie B. Hackett appeals from a judgment that he take nothing on his claim, under 42 U.S.C. § 1983 (1982), that the San Antonio Housing Authority (SAHA) discriminated against him on racial grounds in setting the rents he could charge under a federal rent subsidy program. He contends that the district court committed reversible error in relying upon an exhibit the SAHA presented at the bench trial. We agree that the district court should not have considered the exhibit but hold that the record otherwise amply supports the finding of no discrimination. Accordingly, we affirm.[1]

## I.

### A. *The Section 8 Program*

Understanding the nature of Hackett's claim calls for inquiry into the United States Housing Act of 1937, 42 U.S.C.

---

**1.** Hackett also complains that the district court should have found violations of the Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1982), and the equal protection clause of the Fourteenth Amendment. The infractions that Hackett claims apparently would arise from the SAHA's assessment of his rents primarily on the basis of the location of his units in a predominantly black, low-income neighborhood. To the extent he is alleging intentional discrimination, we find no support for such an allegation in the record. Hackett neither produced evidence to show nor argued that the SAHA authorized lower rents for the Carson Homes area than for other neighborhoods in which fewer blacks lived. Thus, Hackett waived any such claim by failing to present it at trial. *See, e.g., Irby v. Sullivan,* 737 F.2d 1418, 1423 (5th Cir.1984) ("Plaintiff may not raise a claim on appeal that he has not asserted below.") Moreover, insofar as Hackett attacks as "analogous" to "red-lining" the SAHA's focus on his neighborhood in assessing reasonable rents, he states no claim that would entitle him to relief. Whatever injury he has suffered arose not from the SAHA's method of determining rents but from the apparently low value the rental market places on his property.

§§ 1437–1437j (1982), and the regulations that the Act generated. Section 8 of the Act contains the relevant provisions. That section authorizes the Secretary of Housing and Urban Development to contract with local public housing agencies (PHA's) for subsidies of low-income tenants' rental payments. 42 U.S.C. § 1437f(b) (1982). The PHA's, in turn, pass the assistance payments along to landlords pursuant to "assistance contracts", in which the PHA's and landlords join for that purpose. *Id.* Owners remain free to return their dwellings to the open market when their contracts expire. The assistance contracts must specify, however, the maximum monthly rent that the landlord may receive for each unit. *Id.* § 1437f(c)(1). The statute for the most part leaves to the Secretary the task of establishing regulations to guide the PHA's in assessing rental rates. *See id.* § 3535(d) (empowering Secretary to "make such rules and regulations as may be necessary to carry out his functions, powers, and duties").

The regulations set out two limitations on the rents that PHA's may allow owners to charge. The first restriction mandates that rents not exceed by more than ten percent the "fair market rent" that the Secretary establishes for each "area" (city, county, or similar locality) at least once a year. *See* 24 C.F.R. § 882.106(a) (1984). The regulations also establish a "rent reasonableness limitation," which provides as follows:

(1) The PHA shall certify for each unit for which it approves a lease that the Contract Rent for each unit is:

(i) Reasonable in relation to rents currently being charged for comparable units in the private unassisted market, taking into account the location, size, type, quality, amenities, facilities and management and maintenance service of each unit, and

(ii) Not in excess of rents currently being charged by the Owner for comparable unassisted units.

*Id.* § 882.106(b) (1984). The regulations permit "annual" and "special" adjustments to rents but generally proscribe adjustments that "result in material differences between the rents charged for assisted and comparable (as defined in § 882.106(b)) unassisted units...." *Id.* § 882.108(b) (1984).

### B. *Hackett and the Grounds for His Complaint*

Hackett started participating in the section 8 program in 1975. From 1961 through 1970, he had purchased approximately fifty structures that the United States had constructed in the 1940's to house military officers. The housing stood in the Carson Homes area, a predominantly black neighborhood on the eastern side of San Antonio, and the units ranged in size from one to four bedrooms. A broker who had managed the property in Hackett's absence offered at least some of the units in 1975 for section 8, low-income tenants. In 1976, Hackett settled in the city, and he and his family undertook refurbishment of the units. They performed most of the work themselves, repairing various defects and installing new appliances, such as stoves and refrigerators. He or his wife often stayed in one of the units to provide management services.

The events that provoked this action began in 1981. In the early part of that year, Hackett perceived that SAHA inspectors had started to determine the rents he could charge section 8 tenants by comparing his units only to others in the surrounding, predominantly black neighborhood rather than also to similar units in other parts of San Antonio. He complained to the Department of Housing and Urban Development (HUD). HUD responded with a letter advising Hackett that HUD had found no basis for his grievance and stating that "the comparable rents do not support the rents you are asking." In April, Hackett informed the SAHA that an inspector, a white woman, had approved one of his units for $260 despite her feeling that it warranted $290. The inspector's superior, a black man, arranged a meeting later that day with Hackett, his wife, and the inspector to discuss the matter. The inspector informed the Hacketts that she had applied

the rent reasonableness limitation in 24 C.F.R. § 882.106(b), and that the SAHA could accordingly offer no more than $260. The supervisor indicated that he would follow her recommendation. Hackett refused the offer and decided to remove the unit from the program.

In June 1981, Hackett objected to SAHA's reductions of his section 8 rents, and he continued his complaints through the end of the year. He lodged another complaint with HUD but later withdrew it. In most instances, SAHA officials told Hackett that the regulations required them to compare his units with others in the Carson Homes area. SAHA inspectors and their superiors spent a good deal of time responding to Hackett's complaints through inspections, studies, and meetings, but they failed to satisfy his demands. Hackett consequently refused several of SAHA's rent offers but kept a number of his other units in the subsidy program.

In late 1981, the controversy between Hackett and the SAHA reached an impasse. In response to Hackett's rejection of an inspector's rent offers in November, Rod Fauser, SAHA's Chief Inspector for Leased Housing, conducted an investigation of Hackett's complaints. Fauser accompanied the inspector on a reinspection of two of Hackett's units. He also examined dwellings in the surrounding neighborhoods, consulted a real estate agent, and reviewed a study that another inspector had prepared on rents in the Carson Homes area. He concluded that the Carson Homes rents exceeded reasonable levels, and he recorded his findings in a memorandum to the Director of Leased Housing, M.E. Bass. The memorandum recommended specific dollar amounts for each of five unit sizes (according to number of bedrooms) in the area.

On December 3, 1981, Bass embodied Fauser's recommendation in a letter to Hackett and his wife. The letter responded to a meeting that Bass had held with the Hacketts. It stated that "rents for converted military barrack-type units in the Carson Homes area of San Antonio may be approved for Section 8 families in accordance with" Fauser's schedule. Bass advised the Hacketts that the SAHA would not renew their expired assistance contracts except at those rates. Bass did not send a copy of the letter or a similar document to other section 8 landlords in the Carson Homes area, nor did he present the schedule to owners of section 8 units in other parts of San Antonio. Hackett refused to accept Bass's offer but continued to participate in the program. Following various further controversies, Hackett filed this suit against the SAHA for damages, a declaratory judgment, and injunctive relief.

## C. Proceedings Below

The district court tried the case without a jury. Hackett presented evidence showing that a white Carson Homes landlord, Joe L. Colebank, had received a $300 rate for a three-bedroom unit whereas Hackett had gotten the same rate for a larger unit just across the street. Hackett also demonstrated that the SAHA had set a rate of $231 for another white landlord for a Carson Homes two-bedroom unit that contained no stove or refrigerator. Hackett compared the rate on that unit with a $240 rate on his unit which had those appliances. He did not point out, however, what other amenities the white landlords provided. The remainder of his evidence consisted of documents and his testimony regarding his efforts to improve the area and his units, the services he provided, the quality and amenities of his units, and the nature of his clashes with SAHA officials.

The SAHA rebutted in part with an exhibit which was admitted into evidence over objection and which forms the basis of this appeal. Exhibit Z represented the result of studies that the SAHA conducted after Hackett brought this action. It summarized data on approximately 150 section 8 units in the Carson Homes and contiguous areas. The SAHA derived the data from assistance contracts with landlords, field inspection notes, and conversations with some section 8 unit owners. The exhibit provided information on each unit accord-

ing to owner, the owner's race, the address of the unit, the number of bedrooms, and the rental rate for the years 1980 through 1983. The exhibit showed that, on average, Hackett received more section 8 rent per unit than did all other non-black landlords.

In objecting to the admission of Exhibit Z, Hackett urged that the SAHA had not produced the documents that provided the data for the exhibit. That omission, he claimed, violated Fed.R.Evid. 1006, which conditions admissibility of such summaries on the proponent's making available the material underlying the exhibit. Hackett also pointed out inaccuracies in Exhibit Z and further objected that the identification of the race of the owners was derived from hearsay. The district court nonetheless admitted the exhibit.

The court entered judgment for the SAHA, delivering its findings from the bench. The district judge said:

> [A] good lawyer cannot make a case when there isn't one and this "ain't" a discrimination case, and I find princip[al] support for this in Defendant's Exhibit Z, particularly the inter office memo [sic] of December 1, 1982, from Fauser to Bass. I rely upon it. I believe it is accurate and relevant.
>
> \* \* \* \* \* \*
>
> I believe that that last part of his study tells the entire tale, dated December 1, 1982. It focuses on Carson Homes—Rattlesnake Hill, the Ft. Sam Gateway target area, uses nine streets and appears to be professionally done.

The court also noted inaccuracies in Exhibit Z but held that they affected the weight rather than the admissibility of the exhibit. The court denied Hackett's new trial motion, which challenged the court's reliance on Exhibit Z. Hackett appeals from that decision.

**II.**

Our review encompasses two issues: (1) whether the district court erred in admitting Exhibit Z, and, if so, (2) whether the court's reliance upon the exhibit requires a new trial. We consider the questions in turn.

**A. *Admissibility of Exhibit Z***

■ Fed.R.Evid. 1006 allows the admission into evidence of summaries of information but exacts a price: "The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place." Hackett timely demanded that the SAHA produce the documents from which Exhibit Z derived. The SAHA failed to do so, apparently because the original documents no longer existed. That failure rendered the exhibit inadmissible. *See United States v. Kim*, 595 F.2d 755, 764 (D.C.Cir. 1979) (approving district court's refusal to admit summary where underlying documents not available); 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 1006[04], at 1006–10 (1983) (suggesting continuance of trial to allow inspection). The district court thus abused its discretion in receiving and considering Exhibit Z.

■ We also find the exhibit at least in large part inadmissible on a further ground. The SAHA determined the race of each landlord it included in the summary from conversations with a few of the section 8 owners. As such, that information constituted inadmissible hearsay, which can form no part of a Rule 1006 summary. *See, e.g., Soden v. Freightliner Corp.*, 714 F.2d 498, 506 (5th Cir.1983) (upholding exclusion of charts on ground that they derived from hearsay); *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971). Since excising the racial indicia from Exhibit Z would have vitiated its relevance in rebutting the claim of discrimination, the inclusion of hearsay in the exhibit made it largely irrelevant.[2]

---

2. The SAHA argues that we should affirm the admissibility of Exhibit Z under the residual hearsay exception in Fed.R.Evid. 803(5) or (24).

Even assuming that the hearsay—from the underlying documents and the statements from which the SAHA gleaned the racial backgrounds

**1313**

### B. *Need for a New Trial*

■ Our *post hoc* surgery on the trial record does not necessarily portend a new opportunity for Hackett to prove his case. Erroneous receipt of evidence in bench trials undermines rather than destroys the judgment:

> In a non-jury case, the admission of incompetent evidence will not warrant reversal unless all of the competent evidence is insufficient to support the judgment, or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would otherwise not have been made. *Multi-Medical Convalescent and Nursing Center of Towson v. N.L.R.B.*, 550 F.2d 974 (4th Cir.1977), *cert. denied*, 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 7; *Cain v. C.I.R.*, 460 F.2d 1243 (5th Cir. 1972).

*Goodman v. Highland Insurance Co.*, 607 F.2d 665, 668 (5th Cir.1979); *see* Fed.R. Civ.P. 61 ("No error in ... the admission ... of evidence ... is ground for ... vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.") In reviewing fully-tried discrimination cases, we focus on determining the viability of the district court's ultimate conclusion regarding the presence or absence of discrimination. *See, e.g., United States Postal Service v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (Title VII case). We hold that exclusion of Exhibit Z would not have altered the district court's finding that the SAHA did not discriminate against Hackett in setting the rents that he could charge section 8 tenants.

The record permits no other conclusion. A thorough review of the entire record shows that Hackett produced no direct evidence of intentional discrimination; yet, his claim stood or fell on his ability to show that the SAHA treated him differently from non-black section 8 landlords. His was the burden of proof. Although Hackett demonstrated some basis for inferring discrimination, the SAHA overwhelmingly rebutted such an inference with evidence other than Exhibit Z.

The primary thrust of Hackett's presentation consisted of comparisons between his units and the section 8 dwellings that two white landlords owned in the Carson Homes area. One of the white owners, Colebank, received $300 per month for a three-bedroom apartment very similar to a Hackett unit that stood just across the street. Hackett produced photographs of both structures, and he testified that the Colebank unit exhibited lower quality than his. He contended that the SAHA should have authorized him to charge more rent than Colebank.

The other white landlord, Wills, also owned a refurbished barracks-style unit in the neighborhood, and the SAHA permitted a monthly charge for it of $231. Hackett compared Wills's two-bedroom unit, which had no refrigerator or stove, with two of his units, which did have those appliances. He argued that the qualitative differences between his and Wills's units warranted more than the $240 per month that the SAHA offered for his apartments.

The district court, however, gave little weight to the comparisons. The court rejected outright the Colebank analogy, expressly crediting Fauser's testimony that the SAHA inspector had erred in authorizing Colebank to charge $300.[3] Referring to Hackett's evidence that the quality of his units exceeded that of Colebank's and Wills's, the court remarked as follows:

> I don't see it. I don't see it. I don't see it based on the photographs. I don't see it based on the numbers. I don't believe you are going to get much qualitative

---

of owners—falls within the exceptions to the hearsay rule, both of them plainly require the sponsoring party to give pre-trial notice to its adversaries that it intends to invoke the exceptions. The SAHA does not suggest that it provided such notice.

3. The court stated that "well, let me just say, I believe it was a mistake. I believe what Mr. Fauser said, because it is so consistent with everything else."

difference from these houses unless it is just out of the charity of your heart. Discerning in them no clear error, we accept the court's factual findings. Fed.R. Civ.P. 52(a). Hackett thus failed to show to the district court's satisfaction a single instance, other than one instance of admitted error, in which the SAHA rates resulted in preference to non-black landlords.[4]

Evidence that the SAHA as well as Hackett himself introduced actually points in the opposite direction. Hackett's Exhibit 15, which embodied a SAHA inter-office memorandum of December 23, 1981, indicated that Hackett then received $5 more than Colebank did for one-bedroom units and $25 more for two-bedroom units. Exhibit 15 also showed Hackett's section 8 rents well exceeded the amounts that other participants in the program received for units of comparable size throughout San Antonio. Another set of documents, Exhibit DD, presented data as of December 1983 in the form of a computer print-out. Those data reflected that the SAHA had permitted Hackett to charge $13 more per month than Colebank for one-bedroom units, $40 more for two-bedrooms, and $10 more for three-bedrooms. Exhibit Z aside, the district court had before it a plenitude of evidence on which to ground its ultimate conclusion that Hackett had failed to show discrimination.

### III.

Because evidence other than the inadmissible Exhibit Z sufficiently undergirded the district court's finding of no discrimination, we find no abuse of discretion in its refusal to grant a new trial.

AFFIRMED.

4. Although the absence of explicit findings counsels caution, we also believe that the district court discerned little substance in Hackett's other evidence of disparate treatment. In finding no discrimination, the court implicitly rejected Hackett's contentions that the SAHA harassed him by inspecting his units more frequently than other landlords' dwellings and that the December 3 letter from Bass placed a ceiling only on the rents that Hackett could charge. Fauser testified that the ceiling provided guidelines rather than inflexible limits and that the rent schedule applied to all section 8 landlords who owned barracks-style units in the Carson Homes area. He also stated that the frequency of inspections responded to the more numerous complaints that Hackett lodged and that his tenants pressed against him. The court thus accepted the SAHA's explanation that it presented only Hackett with the December 3 schedule and often inspected his units not out of racial animus against him but in response to his grievances and those that others presented.