PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ELM GROVE COAL COMPANY,
                              *Petitioner,*

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED               No. 05-1108
STATES DEPARTMENT OF LABOR;
VELMA BLAKE, Widow of Ivan
Randall Blake,
                              *Respondents.*

On Petition for Review of a Decision and Order
of the Benefits Review Board.
(04-186-BLA)

Argued: February 3, 2006

Decided: March 7, 2007

Before NIEMEYER, MOTZ,[1] and KING, Circuit Judges.

Petition for review granted in part; Decision and Order vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Niemeyer joined.

[1]Judge Motz participated in oral argument in this case, but recused herself prior to it being decided. This decision is thus rendered by a quorum of the panel.

**COUNSEL**

**ARGUED:** Douglas Allan Smoot, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Petitioner. Barry H. Joyner, UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington, D.C.; Anne Megan Davis, JOHNSON, JONES, SNELLING, GILBERT & DAVIS, P.C., Chicago, Illinois, for Respondents. **ON BRIEF:** Kathy L. Snyder, JACKSON & KELLY, P.L.L.C., Morgantown, West Virginia, for Petitioner. Howard M. Radzely, Solicitor of Labor, Donald S. Shire, Associate Solicitor, Christian P. Barber, Counsel for Appellate Litigation, Rita A. Roppolo, UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington, D.C., for Respondent Director, Office of Workers' Compensation Programs. Thomas E. Johnson, JOHNSON, JONES, SNELLING, GILBERT & DAVIS, P.C., Chicago, Illinois, for Respondent Velma Blake, Widow of Ivan Randall Blake.

---

**OPINION**

KING, Circuit Judge:

Elm Grove Coal Company petitions for review of the December 2004 Decision and Order of the Benefits Review Board (the "BRB") affirming the award of benefits made by an Administrative Law Judge ("ALJ") to retired coal miner Ivan R. Blake under the Black Lung Benefits Act, 30 U.S.C. §§ 901-945 (the "Black Lung Act" or the "Act").[2] Elm Grove raises multiple contentions of error, including, of most significance: (1) a claim that recently amended regulations limiting the admissible medical evidence in Black Lung Act proceedings are invalid; (2) alternatively, that the new evidence-limiting rules, if valid, were nonetheless misapplied by the ALJ in excluding certain evidence submitted by Elm Grove; and (3) that the ALJ erroneously barred Elm Grove's discovery of draft reports and communications

---

[2]The Director of the Office of Workers' Compensation Programs (the "Respondent Director" or the "Director") and Velma Blake, widow of Ivan R. Blake (the "Respondent Blake" or simply "Blake") are the two respondents in this proceeding.

between Blake's lawyers and their expert witnesses. As explained below, we reject the first of these three contentions, but agree with Elm Grove on its second and third contentions. We thus grant Elm Grove's petition for review in part, vacate the 2004 Decision and Order of the BRB, and remand for such further proceedings as may be appropriate.[3]

I.

A.

1.

Enacted on December 30, 1969, the Black Lung Act is intended to provide benefits to coal miners who have been totally disabled by pneumoconiosis, as well as to the surviving dependents of miners whose deaths were due to such disease. *See* 30 U.S.C. § 901.[4] Under Part B of the Act, *see id.* §§ 921-925, claims filed on or before December 31, 1973, are to be adjudicated by the Secretary of Health and Human Services and paid by the United States. Pursuant to Part C of the Act, *see id.* §§ 930-944, claims filed after December 31, 1973, are to be adjudicated by the Secretary of Labor (the "Secretary") and, in the absence of an approved state workers' compensation law, paid by the responsible mine operator.

The Black Lung Act incorporates various other statutory provisions — including provisions pertaining to administrative rule-making and adjudication of claims — by both internal cross-reference and refer-

---

[3]Elm Grove also contends that the ALJ's findings of pneumoconiosis and of totally disabling pulmonary or respiratory impairment due to pneumoconiosis are irrational, not supported by substantial evidence, and contrary to law. We need not reach these contentions because we vacate the Decision and Order of the BRB on other grounds and remand for further proceedings.

[4]It is recognized that "[c]oal workers' pneumoconiosis — black lung disease — affects a high percentage of American coal miners with severe, and frequently crippling, chronic respiratory impairment." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 6 (1976). "The disease is caused by long-term inhalation of coal dust." *Id.*

ence to other statutes. For instance, its Part C incorporates, "to the extent appropriate," the provisions of Part B. 30 U.S.C. § 940. Part B, in turn, incorporates a number of provisions from Title II of the Social Security Act. *Id.* § 923(b). One such incorporated provision from the Social Security Act is 42 U.S.C. § 405(a), which endows the Commissioner of Social Security with the "full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions," and to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder."

Significantly, Part B of the Black Lung Act mandates that, "[i]n determining the validity of claims under this part, *all relevant evidence* shall be considered." 30 U.S.C. § 923(b) (emphasis added) (the "All Relevant Evidence Provision" or the "Provision"). The All Relevant Evidence Provision was added to the Act in 1972, in the context of prohibiting the denial of benefits based only on the results of a chest roentgenogram. *See id.* In fuller part, the Provision reads as follows:

> No claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram. In determining the validity of claims under this part, *all relevant evidence* shall be considered, including, where relevant, medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials.

*Id.* (emphasis added).

Finally, Part C of the Black Lung Act incorporates certain provisions of the Longshore and Harbor Workers' Compensation Act, including 33 U.S.C. § 919(d), which in turn incorporates provisions

of the Administrative Procedure Act (the "APA"), by reference to 5 U.S.C. § 554. *See* 30 U.S.C. § 932(a). The APA provides, as relevant here, that "[a]ny oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d) (the "Irrelevant Evidence Exclusion").

2.

On December 20, 2000, after several years of consideration, the Secretary issued sweeping revisions to the rules governing the adjudication of miners' claims under Part C of the Black Lung Act, effective January 19, 2001.[5] *See* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79,920 (Dec. 20, 2000) (to be codified at 20 C.F.R. pts. 718, 722, 725-727) (the "Amended Regulations"). The Amended Regulations include limitations on the amount of medical evidence that each party may submit (the "Evidence-Limiting Rules"). The Secretary proposed the Evidence-Limiting Rules "in order to ensure that eligibility determinations are based on the best quality evidence submitted rather than on the quantity of evidence submitted by each side." Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 62 Fed. Reg. 3338, 3338 (proposed Jan. 22, 1997) (to be codified at 20 C.F.R. pts. 718, 722, 725-727). In explaining, the Secretary observed that,

> [c]urrently, in establishing their eligibility to benefits, claimants must confront the vastly superior economic resources of

[5]Under the Act, a miner or his survivor seeking benefits under Part C of the Act must first file a claim with the District Director in the Department of Labor's Office of Workers' Compensation Programs. The District Director then determines, in relevant part, whether the claimant is entitled to benefits and which mine operator is responsible for paying them. If a party is dissatisfied with the District Director's determination, that party may appeal by requesting a formal hearing before an ALJ. The ALJ's ruling may subsequently be appealed to the BRB, and the BRB's decision may be appealed to the court of appeals in the appropriate circuit. *See National Mining Ass'n v. Dept. of Labor*, 292 F.3d 849, 854 (D.C. Cir. 2002).

their adversaries: coal mine operators and their insurance carriers. Often, these parties generate medical evidence in such volume that it overwhelms the evidence supporting entitlement that claimants can procure. The proposed changes limiting evidentiary development attempt to make more equitable the adjudication of black lung claims and reduce the costs associated with these cases.

*Id.*; *see also* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. at 79,989-95 (describing development of Evidence-Limiting Rules and reasons for them).

The Evidence-Limiting Rules, as promulgated, are found in the Code of Federal Regulations, in various subparts of 20 C.F.R. § 725. Pursuant thereto, a claimant and the responsible operator are each entitled to submit, in support of their respective affirmative cases, "no more than two chest X-ray interpretations, the results of no more than two pulmonary function tests, the results of no more than two arterial blood gas studies, no more than one report of an autopsy, no more than one report of each biopsy, and no more than two medical reports." 20 C.F.R. § 725.414(a)(2)(i), (3)(i).[6] They further provide that "[a]ny chest X-ray interpretations, pulmonary function test results, blood gas studies, autopsy report, biopsy report, and physicians' opinions that appear in a medical report must each be admissible under" either paragraph (a)(2)(i), paragraph (a)(3)(i), or paragraph (a)(4) (allowing "any record of a miner's hospitalization for a respiratory or pulmonary or related disease, or medical treatment for a respiratory or pulmonary or related disease, [to] be received into evidence"). § 725.414(a)(2)(i), (3)(i).

---

[6]The Evidence-Limiting Rules define a "medical report" as "a physician's written assessment of the miner's respiratory or pulmonary condition." 20 C.F.R. § 725.414(a)(1). Such a "report may be prepared by a physician who examined the miner and/or reviewed the available admissible evidence." *Id.* The Evidence-Limiting Rules exclude from the "medical report" definition "[a] physician's written assessment of a single objective test, such as a chest X-ray or a pulmonary function test." *Id.*

To rebut evidence submitted in support of an opposing party's affirmative case, the claimant and the responsible operator each may submit, inter alia, "no more than one physician's interpretation of each chest X-ray, pulmonary function test, arterial blood gas study, autopsy or biopsy" submitted by the opposing party. § 725.414(a)(2)(ii), (3)(ii).[7] Finally, in response to rebuttal evidence with respect to medical testing, the Evidence-Limiting Rules authorize a party to "submit an additional statement from the physician who originally interpreted the chest X-ray or administered the objective testing." *Id.* And, in the event that "rebuttal evidence tends to undermine the conclusion of a physician who prepared a medical report," a party may "submit an additional statement from the physician who prepared the medical report explaining his conclusion in light of the rebuttal evidence." *Id.*

The limitations on the introduction of medical evidence imposed by the Evidence-Limiting Rules also apply to the testimony of physicians, either in person or by deposition. *See* 20 C.F.R. § 725.457(d) (providing that "[a] physician whose testimony is permitted under this section may testify as to any other medical evidence of record, but shall not be permitted to testify as to any medical evidence relevant to the miner's condition that is not admissible"); 20 C.F.R. § 725.458 (requiring that "[t]he testimony of any physician which is taken by deposition shall be subject to the limitations on the scope of the testimony contained in § 725.457(d)").

Significantly, the Evidence-Limiting Rules also spell out that medical evidence in excess of the limitations contained therein may be admitted into the hearing record in a Black Lung Act proceedings for

---

[7]The Evidence-Limiting Rules further allow each party to submit additional evidence to rebut the results of any other testing submitted by the opposing party under 20 C.F.R. § 718.107 (authorizing party to submit "[t]he results of any medically acceptable test or procedure reported by a physician and not addressed in this subpart, which tends to demonstrate the presence or absence of pneumoconiosis, the sequelae of pneumoconiosis or a respiratory or pulmonary impairment"). Where the results of such other testing have been submitted, the opposing party may "submit one physician's assessment of each piece of such evidence in rebuttal." 20 C.F.R. § 725.414(a)(2)(ii), (3)(ii).

"good cause." *See* 20 C.F.R. § 725.456(b)(1) ("Medical evidence in excess of the limitations contained in § 725.414 shall not be admitted into the hearing record in the absence of good cause.").

3.

By its June 2002 decision in *National Mining Ass'n v. Department of Labor*, the District of Columbia Circuit (the first and only other circuit to consider the validity of the Evidence-Limiting Rules), upheld the Evidence-Limiting Rules against a challenge brought by mine operators, insurance companies, and the National Mining Association (collectively, "National Mining"). *See* 292 F.3d 849, 873-74 (D.C. Cir. 2002).[8] National Mining contended that the Evidence-Limiting Rules ran afoul of the APA's authorization for "each party to submit whatever evidence that party thinks is needed to prove its case or defense." *Id.* at 873 (internal quotation marks omitted). The D.C. Circuit disagreed, however, concluding that National Mining's theory that the APA "permits introduction of unlimited amounts of evidence is flatly contradicted by the statute itself, which," under the Irrelevant Evidence Exclusion, "empowers agencies to 'exclu[de] . . . irrelevant, immaterial, or unduly repetitious evidence' as 'a matter of policy.'" *Id.* at 873-74 (quoting 5 U.S.C. § 556(d)) (alteration in original). The court of appeals further observed that the Black Lung Act "authorizes the Secretary to issue regulations 'provid[ing] for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the rights to benefits.'" *Id.* at 874 (citing 30 U.S.C. § 923(b) (incorporating 42 U.S.C. § 405(a))) (alteration in original).

In upholding the Evidence-Limiting Rules, the D.C. Circuit rejected National Mining's assertion that the rules established "inflexible limits." *National Mining*, 292 F.3d at 874. The court recognized and emphasized that, "[o]n the contrary, the rules give ALJs discretion to hear additional evidence for 'good cause.'" *Id.* (citing 20 C.F.R. § 725.456(b)(1)). Furthermore, the court of appeals discredited National Mining's contention that the Evidence-Limiting Rules are

---

[8]The *National Mining* appellants also challenged (with some success) various other aspects of the Amended Regulations that are not at issue in this proceeding. *See* 292 F.3d at 867-75.

"arbitrary and capricious because they are unsupported by medical evidence." *Id.* The court cited record evidence indicating that the new evidentiary limits, rather than being "artificial," were devised to "enable ALJs to focus their attention on the quality of the medical evidence in the record before them." *Id.* (internal quotation marks and alteration omitted). The court also observed that the record reflected "the need for evidence limitations," because, "in their absence, lawyers often waste ALJs' time and resources with excessive evidence." *Id.* (noting example where "mine operator's lawyer submitted eighty-nine separate X-ray re-readings from fourteen different experts"). Finally, the D.C. Circuit emphasized National Mining's concession at oral argument "that ALJs have always had discretion to exclude evidence in precisely the manner outlined by the new evidence-limiting rules." *Id.* The court of appeals thus reasoned that "it would be strange indeed to conclude that the Secretary acted arbitrarily and capriciously by codifying evidentiary limits that ALJs have always had the discretion to impose." *Id.*

## B.

Ivan Blake filed the application for benefits at issue in this proceeding on April 4, 2001 (following the January 19, 2001 effective date of the Evidence-Limiting Rules).[9] On March 6, 2002, the District Director awarded benefits to Blake. At Elm Grove's request, the matter was subsequently forwarded to an ALJ (the "first ALJ") for a formal hearing.

By Order of November 26, 2002, the first ALJ addressed several pre-hearing issues raised by the parties. *See* J.A. 657-60.[10] First, he denied a motion by Elm Grove to compel Blake to produce draft reports and communications sent by his counsel to their physician-experts. In so ruling, the first ALJ concluded that the communications sought by Elm Grove were "protected by the work product doctrine, and thus, not discoverable." *Id.* at 659. Next, he ruled, noting Elm

---

[9]Blake's April 4, 2001 application for benefits was his second such application. He had filed his first application in 1986, which the Director denied.

[10]Our citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

Grove's objection to the validity of the Evidence-Limiting Rules, that he was constrained under the D.C. Circuit's *National Mining* decision to apply those Rules. Finally, the first ALJ denied a motion by Blake to exclude evidence submitted by Elm Grove in excess of that permitted under the Evidence-Limiting Rules, but informed the parties that he would entertain a renewal of the motion at the hearing on Blake's claim.

On June 4, 2003, the hearing on Blake's claim was held in Wheeling, West Virginia, before a different ALJ (the "second ALJ") than the one who had handled the pre-hearing motions (the "ALJ hearing"). *See* J.A. 720-802. At the outset of the ALJ hearing, the second ALJ observed that "this case is under the new regulations [including the Evidence-Limiting Rules] as it was filed after January 19, 2001," and that, "therefore, the evidentiary limitations which are in effect in those new regulations apply, except for showing of good cause." *Id.* at 724. Consistent with his reading of 20 C.F.R. § 725.414(a)(3)(ii), the second ALJ limited Elm Grove to introducing one physician's interpretation of an X-ray to rebut two interpretations of that same X-ray being submitted by Blake in his affirmative case. In so ruling, the second ALJ rejected Elm Grove's contention that it should be allowed to rebut Blake's two interpretations of the X-ray with two interpretations of its own.

During the ALJ hearing, Elm Grove noted its intention to contest the validity of the Evidence-Limiting Rules, and reiterated its position that it was entitled to documents provided to Blake's experts by his counsel. The second ALJ responded that he was inclined "to abide by the prior ruling in the case," excluding discovery of the attorney-expert communications under the work product doctrine. J.A. 751. Elm Grove then discussed the evidence that it wished to submit in excess of the restrictions set forth in the Evidence-Limiting Rules. When the second ALJ asked for Elm Grove's "good cause argument," Elm Grove replied that "[o]ur good cause argument in this case would be that under the Fourth Circuit's Decision in the *Underwood* case, they have deemed that all relevant evidence should be considered and, therefore, the *Underwood* case in this position would triumph over the regulation. Our contention is essentially the regulation is invalid." *Id.* at 765; *see Underwood v. Elkay Mining, Inc.*, 105 F.3d 946 (4th Cir. 1997) (examining interplay between Irrelevant Evidence Exclusion

and All Relevant Evidence Provision and concluding that ALJ had not erred in admitting cumulative evidence). The second ALJ rejected Elm Grove's contention, observing that *Underwood* "was decided under the old regulations." J.A. 765. He further rejected Elm Grove's assertion that the D.C. Circuit's decision in *National Mining* was not binding precedent, explaining that "it's binding unless there's precedent to the contrary in the Fourth Circuit. And there isn't." *Id.* at 766.

On October 16, 2003, the second ALJ issued his Decision and Order awarding benefits to Blake (the "ALJ Decision"). *See* J.A. 803-20. In relevant part, the second ALJ concluded that his previous rulings on evidentiary issues "shall stand." *Id.* at 805 n.4. Elm Grove appealed the ALJ Decision to the BRB, which affirmed the award of benefits to Blake by its Decision and Order of December 28, 2004 (the "BRB Decision"). *See* J.A. 821-38.[11] In relevant part, the BRB Decision rejected Elm Grove's challenge to the validity of the Evidence-Limiting Rules, including its contentions that the Rules were in conflict with the All Relevant Evidence Provision and our decision in *Underwood*. The BRB concluded that the Secretary had properly promulgated the Evidence-Limiting Rules pursuant to the Black Lung Act's authorization to regulate "the nature and extent of proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits," 30 U.S.C. § 923(b) (incorporating 42 U.S.C. § 405(a)), and the APA's empowerment of agencies to "provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence" as "a matter of policy," 5 U.S.C. § 556(d).

The BRB Decision affirmed the exclusion of evidence submitted by Elm Grove in excess of that permitted under the Evidence-Limiting Rules without a showing of "good cause." J.A. 825. With respect to Elm Grove's X-ray interpretation rebuttal evidence, the BRB Decision upheld the second ALJ's ruling limiting Elm Grove to one interpretation to rebut the two interpretations submitted by Blake. *Id.* Finally, the BRB Decision rejected Elm Grove's assertion that it was entitled to copies of draft reports and communications from

---

[11]In rendering the BRB Decision of December 28, 2004, one of three members of the Board dissented on one merits issue, which he would have remanded for further consideration. *See* J.A. 838. That issue is not implicated in this proceeding.

Blake's lawyers to their experts; in so doing, the BRB determined that the ALJs did not abuse their discretion in applying the work product doctrine. *Id.* at 826-27.

Elm Grove has timely filed its petition for review in this Court, and we possess jurisdiction pursuant to 33 U.S.C. § 921(c).

II.

Elm Grove presents three primary contentions in this appeal.[12] First and foremost, it challenges the validity of the Evidence-Limiting Rules (the "Evidence-Limiting Rules issue"). That is, Elm Grove contends that the Evidence-Limiting Rules conflict with controlling precedent and provisions of the Black Lung Act, and that they arbitrarily and capriciously limit the evidence that each party can submit in proceedings under the Act. We review the Evidence-Limiting Rules issue de novo, pursuant to the two-step process enunciated by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984). In so doing, we first examine Elm Grove's contention that our 1997 decision in *Underwood v. Elkay Mining, Inc.*, 105 F.3d 946 (4th Cir. 1997) constitutes controlling precedent. We then turn to our *Chevron* analysis, assessing whether Congress has spoken directly and conclusively on the Evidence-Limiting Rules issue. *Id.* at 842. Because no such congressional intent is identified, we must assess whether the Evidence-Limiting Rules, as promulgated by the Secretary, are based on a permissible construction of the Black Lung Act. *Id.* at 843.

Although the Evidence-Limiting Rules issue presents a close question, we nevertheless must reject Elm Grove's contention that the Rules are invalid. Accordingly, we examine two other contentions made by Elm Grove in its petition: (1) that the second ALJ improp-

---

[12]Other than Elm Grove's primary contentions, as spelled out above, certain additional assertions are addressed and disposed of in our footnotes. *See* notes 3, 14, & 18. Two final contentions, that the ALJ erred in finding that Blake had shown good cause to submit late evidence, and that the ALJ failed to consider certain X-ray classifications by two of Elm Grove's experts, have also been carefully considered, do not merit further discussion, and are rejected.

erly excluded certain rebuttal evidence from the ALJ hearing ("the Rebuttal Evidence issue"); and (2) that the ALJs and the BRB erred in failing to compel discovery of certain draft reports and attorney-expert communications between Blake's lawyers and their experts (the "Work Product issue"). As to the Rebuttal Evidence issue, we review de novo any legal issue on the proper standard to be applied for the "admission of evidence in hearings before the ALJ under the Black Lung Benefits Act," and we review for abuse of discretion any "question about the proper application of that standard." *Underwood*, 105 F.3d at 948-49. On the Work Product issue, we review de novo the legal conclusions made by the ALJs and the BRB, and we assess for abuse of discretion their application of that standard. *See Consol. Coal. Co. v. Williams*, 453 F.3d 609, 614 (4th Cir. 2006); *Underwood*, 105 F.3d at 948-49.

## III.

Elm Grove's contention on the Evidence-Limiting Rules issue warrants our analysis of two separate but related assertions.[13] First, Elm Grove maintains that our 1997 decision in *Underwood v. Elkay Mining, Inc.*, 105 F.3d 946 (4th Cir. 1997) is "still the law in the Fourth Circuit" and that the Evidence-Limiting Rules impermissibly conflict with that decision's interpretation of the All Relevant Evidence Provision. Petr.'s Br. 21-22. Second, Elm Grove contends that the Evidence-Limiting Rules "fail both prongs of the *Chevron* test," asserting that the Rules are inconsistent with the plain language of the Provision and are not premised on any reasonable construction of the Act. *Id.* at 19.[14]

---

[13]On the Evidence-Limiting Rules issue, Blake adopts the position of the Director.

[14]In its opening brief, Elm Grove summarily asserts that the Evidence-Limiting Rules violate its "procedural and substantive due process rights by denying the parties a full and fair hearing." Petr.'s Br. 15. Elm Grove does not explain the basis for this contention, does not reference any relevant case law or portions of the record, and does not otherwise explain its contention. Accordingly, we deem this contention abandoned. *See* Fed. R. App. P. 28(a)(9)(A) (noting that appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *see*

The Respondent Director, on the other hand, contends that the Evidence-Limiting Rules are entitled to *Chevron* deference, that they are based on a permissible and reasonable construction of the Black Lung Act, and that they were adopted pursuant to the Secretary's "express statutory authority to adopt rules regulating the extent of the proofs and evidence." Fed. Resp't's Br. 5.[15] The Director further asserts that *Underwood* is not controlling precedent in this proceeding, maintaining that it addressed a different issue than that presented here, and that it was rendered well before the Secretary's promulgation of the Evidence-Limiting Rules. Accordingly, the Director urges us to uphold the validity of the Evidence-Limiting Rules, as did the D.C. Circuit in 2002 with its *National Mining* decision.

A.

We begin our analysis with Elm Grove's contention that the Evidence-Limiting Rules conflict with *Underwood*. There, we were called upon to consider the interplay between the Act's All Relevant Evidence Provision and the APA's Irrelevant Evidence Exclusion. Retired coal miner Elmer Underwood contended that an ALJ had committed reversible error in denying him black lung benefits, by admitting cumulative evidence offered against his claim by his former employer, Elkay Mining. *Underwood*, 105 F.3d at 948. In support of

---

*also Edwards v. City of Goldsboro*, 178 F.3d 231, 241 (4th Cir. 1999) (concluding that failure to comply with specific dictates of Rule 28(a)(9)(A) with respect to particular claim triggers abandonment of that claim on appeal).

[15]The Director also maintains in this proceeding that the All Relevant Evidence Provision is not binding on claims filed after 1973. *See* Fed. Resp't's Br. 11. He asserts that this Provision was included in the 1972 amendments to Part B of the Act (pertaining to claims filed with Social Security Administration before December 31, 1973), and that Part C of the Act (pertaining to claims filed with Department of Labor after December 31, 1973) incorporates the 1972 amendments only "to the extent appropriate." 30 U.S.C. § 940. We need not reach the merits of the Director's contention in this respect. Because the Evidence-Limiting Rules are valid and not inconsistent with the Provision, we accept the point that the Provision was incorporated into Part C of the Act for the purposes of this proceeding.

the ALJ's ruling, Elkay Mining maintained "that ALJ's are required to admit all evidence, subject to objection, giving it weight where appropriate." *Id.* at 949. In support of this proposition, Elkay Mining relied on the Provision, as well as the BRB's earlier ruling in *Cochran v. Consolidation Coal Co.*, 12 BLR (CCH) 1-136, 1-138 (Ben. Rev. Bd. 1989). In *Cochran*, the BRB concluded that ALJs are "required, subject to the objection by any party, to admit into the record all evidence that has been timely developed and exchanged in accordance with" applicable procedures. *Id.* at 1-138. Underwood countered that the Irrelevant Evidence Exclusion "nevertheless requires the exclusion of irrelevant, immaterial, or unduly repetitious evidence." *Underwood*, 105 F.3d at 949 (internal quotation marks omitted). In resolving this dispute, Judge Niemeyer explained that the parties' contentions "appear[ed], at first blush, to be in conflict," but that "a closer look demonstrate[d] that they [were] not entirely inconsistent." *Id.*

We began our analysis in *Underwood* "with the statutory command" of the All Relevant Evidence Provision, coupled "with the recognition that black lung benefits proceedings are nonjury trials conducted before ALJs who are charged with both conducting the hearing and making findings of fact." 105 F.3d at 949. In so recognizing, we observed that,

> [i]n ruling on evidence, an ALJ sees both excludable and nonexcludable evidence, but in making a decision, he considers only admitted evidence. Because the ALJ is presumably competent to disregard that evidence which should be excluded or to discount that evidence which has lesser probative value, it makes little sense, as a practical matter, for a judge in that position to apply strict exclusionary evidentiary rules.

*Id.* Substantiating the conclusion that strict exclusionary rules would make little sense in Black Lung Act proceedings, we invoked our decision in *Multi-Medical Convalescent & Nursing Center of Towson v. NLRB*, 550 F.2d 974 (4th Cir. 1977), where we had discussed the long-settled principle that an appellate court will rarely reverse a judgment in a nonjury case because of the admission of incompetent evidence. *See Underwood*, 105 F.3d at 949-50 (citing *Multi-Med.*, 550

F.2d at 977). And we repeated the advice given to administrative agencies in *Multi-Medical*: "'if in doubt, let it in.'" *Id.* at 950 (quoting *Multi-Med.*, 550 F.2d at 978). Indeed, we observed that the BRB had applied our *Multi-Medical* decision in *Cochran* to "reach[ ] what might appear to be an almost absolute rule that the ALJ is required to admit all evidence that is timely developed and exchanged." *Underwood*, 105 F.3d at 950. As we observed, although the BRB had recognized in *Cochran* "the statutory limitations of relevancy," it had also instructed "that where relevance is 'questionable,' the trier of fact would be better advised to admit the evidence." *Id.* (citing *Cochran*, 12 BLR (CCH) at 1-138).

Against this backdrop, we then examined the Irrelevant Evidence Exclusion, observing that the exclusion of "irrelevant," "immaterial," and "unduly repetitious" evidence need not conflict with the All Relevant Evidence Provision and the BRB's *Cochran* decision. *Underwood*, 105 F.3d at 950. Focusing on unduly repetitious evidence, we explained that such evidence "has little or no probative value and does not fall within the statutory mandate to consider all 'relevant' evidence." *Id.* We concluded that the Irrelevant Evidence Exclusion

> grants ALJ's broad discretion to exclude excessive evidence which lacks significant probative value and, by implication, to limit examinations, evaluations, and consultations by experts when such events will, in the ALJ's judgment, merely give rise to evidence so unduly repetitious as to be lacking in probative value.

*Id. Underwood* specifically warned, however, that we did "not mean to authorize the ALJ to exclude merely repetitious or cumulative evidence so long as such evidence retains nontrivial probative value." *Id.* Rather, we carefully explained that, if evidence is to be excluded:

> [The ALJ] must conclude that the evidence serves little useful value other than to expand the record, impose additional cost, or repeat that which is already well established in the record. Two independent and qualified expert opinions that agree on a disputed point may be substantively more probative than one. And while four similar opinions also may be more probative than two, it does not follow that four are

twice as probative as two. There is a point of diminishing returns and a point at which additional evidence provides almost no value. Such determinations are matters for consideration by the ALJ based on the extent and nature of the dispute on the issue, the closeness of the question, and the nature of the opinions and qualifications of the experts giving them.

*Id.* Finally, we admonished ALJs adjudicating Black Lung Act claims to "recognize that they must consider all relevant evidence, erring on the side of inclusion, but [to] exclude evidence that becomes unduly repetitious in the sense that the evidence provides little or no additional probative value." *Id.* at 951.[16]

In its petition for review, Elm Grove contends that *Underwood* is controlling in this proceeding, and that it is inconsistent with the Evidence-Limiting Rules. To the contrary, although *Underwood*'s reasoning is persuasive, it is not directly on point and does not constitute precedent on the Evidence-Limiting Rules issue. *Underwood* was decided in 1997, well before the Secretary, in 2001, promulgated the Evidence-Limiting Rules. Accordingly, the *Underwood* panel had no reason to consider whether regulations limiting the amount of evidence admissible in black lung proceedings might conflict with the Black Lung Act. Instead, *Underwood* only assessed the interplay between the All Relevant Evidence Provision and the Irrelevant Evidence Exclusion — in the absence of the Evidence-Limiting Rules — and decided that the ALJ had not erred in failing to exclude certain evidence.

As Elm Grove emphasizes, *Underwood* characterized the All Relevant Evidence Provision as a "statutory command" and treated it as requiring the admission of all proffered relevant evidence. *Underwood*, 105 F.3d at 949. We did so, however, without the benefit of the Secretary's Evidence-Limiting Rules. As *Chevron* and its prodigy

---

[16]In *Underwood*, we concluded that the ALJ did not abuse his discretion in admitting the cumulative evidence submitted by Elkay Mining. *See Underwood*, 105 F.3d at 951 ("The fact that the evidence was cumulative does not render it, *ipso facto*, 'unduly repetitious' as the term is used in the Administrative Procedure Act . . . .").

mandate, we cannot impose our own statutory construction, "as would be necessary in the absence of an administrative interpretation," in evaluating the views of the administrative agency entrusted with a statutory scheme. *Chevron*, 467 U.S. at 843. Instead, we must accord the Evidence-Limiting Rules the deference owed to an "executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844.

The Supreme Court's recent decision in *National Cable & Television Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005), explained the proper interplay between a prior judicial decision and an agency construction of the same statutory provision. In *Brand X*, the Court concluded that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. Observing that this "principle follows from *Chevron* itself," the Court determined that "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Id.* at 982-83. Unfortunately for Elm Grove, *Underwood* did not hold that the All Relevant Evidence Provision unambiguously forecloses an agency interpretation and leaves no room for agency discretion. Accordingly, to the extent that *Underwood* may conflict with the Evidence-Limiting Rules, it does not trump those Rules, which constitute the Secretary's interpretation of the All Relevant Evidence Provision. As a result, we are obliged to accord proper deference to the Secretary, as "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Id.* at 980 (citations omitted).

B.

1.

We turn next to an assessment of Elm Grove's contention that the Evidence-Limiting Rules are invalid because they impermissibly conflict with the All Relevant Evidence Provision of the Black Lung Act

and, in so doing, apply the framework established by the Supreme Court in *Chevron. See Chevron*, 467 U.S. at 842-43. In applying *Chevron*, we first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. Our *Chevron* analysis would end at that point if the intent of Congress is clear, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, "Congress has not directly addressed the precise question at issue," we may not substitute our own construction of the statute. *Id.* at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* In that regard, the courts have "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844.

2.

Before we can accord *Chevron* deference to the Evidence-Limiting Rules, however, we must decide whether Congress delegated the necessary rule-making authority to the Secretary of Labor. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (holding that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"); *see also A. T. Massey Coal Co. v. Barnhart*, 472 F.3d 148, 166 (4th Cir. 2006) (limiting *Chevron* deference to circumstances where Congress has given an agency authority to make rules and "the agency's interpretation is rendered in the exercise of that authority"). As the Supreme Court has explained, the requisite congressional delegation of authority "may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead Corp.*, 533 U.S. at 227.

In this situation, we can readily ascertain that Congress delegated the necessary rule-making authority to the Secretary of Labor. Section 936 of the Black Lung Act authorizes the Secretary to issue regula-

tions "appropriate to carry out the provisions of this subchapter," and specifically provides that such regulations are to be promulgated in conformity with the notice-and-comment rule-making provisions of the APA. *See* 30 U.S.C. § 936 (providing that "[s]uch regulations shall be issued in conformity with section 553 of Title 5, notwithstanding subsection (a) thereof."). By way of incorporation from the Social Security Act, the Act instructs the Secretary to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." *See* 30 U.S.C. § 923(b) (incorporating 42 U.S.C. § 405(a)).

In addition, the applicable provisions of the APA instruct that "[a]ny oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d). As we noted in 1999 in *United States Steel Mining Co. v. Director, Office of Workers Compensation*, the APA provides for such evidentiary exclusions "[b]ecause the wholesale admission of all evidence would unnecessarily prolong and burden the process." 187 F.3d 384, 388 (4th Cir. 1999).

By way of § 936, and Congress having incorporated § 405(a) of the Social Security Act and § 556(d) of the APA into the Black Lung Act, the Secretary has been vested with broad authority to implement the mandate of the Black Lung Act. Pursuant thereto, the Secretary is authorized to adopt reasonable regulations on the nature and extent of the proofs and evidence in order to establish rights to benefits under the Act, and to exclude evidence that is irrelevant, immaterial or unduly repetitious as a matter of policy. Accordingly, the Evidence-Limiting Rules, as promulgated by the Secretary, "qualif[y] for *Chevron* deference." *Mead Corp.*, 533 U.S. at 226. Because Congress has expressly delegated authority to the Secretary to "elucidate a specific provision of the statute by regulation," we are obliged to accord the Evidence-Limiting Rules "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

## C.

### 1.

In applying *Chevron*, we must first assess Elm Grove's contention that the All Relevant Evidence Provision represents the clear and unambiguous intention of Congress to preclude any limitations on admissible evidence in Black Lung Act proceedings. *See Chevron*, 467 U.S. at 842. Elm Grove would have us rule that the Provision requires the admission of all proffered evidence, without regard to any exclusionary principle other than relevance. As the Director points out, however, the terms of the Provision, and the statutory provisions incorporated therein, conflict with Elm Grove's contention.

In undertaking the task of statutory construction, we "must not be guided by a single sentence or member of a sentence," but instead must "look to the provisions of the whole law, and to its object and policy." *U. S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (internal citations omitted). As we have heretofore concluded, "the traditional rules of statutory construction to be used in ascertaining congressional intent include: the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and a consideration of other relevant statutes." *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 162 (4th Cir. 1998) (internal quotation marks and citations omitted). With these principles in mind, we turn to Elm Grove's contention on the Provision.

### 2.

First of all, it is essential that the All Relevant Evidence Provision be read and assessed in its entirety. Notably, the "all relevant evidence" language follows the portion of the Provision that provides, in relevant part, that "[n]o claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram." 30 U.S.C. § 923(b). Instead of relying merely on a chest roentgenogram, or chest X-ray, the All Relevant Evidence Provision instructs the Secretary to consider "all relevant evidence" in determining the validity of benefits claims pursued under the Black Lung Act. Rather than constituting a prohibition against the promulgation of regulations

that might limit the quantity of evidence, the "all relevant evidence" language, read and assessed in the context of the sentence immediately preceding it, precludes the Secretary from relying on only one type of evidence, that is, a chest roentgenogram, in assessing claims for benefits under the Act. These sentences are more appropriately read in conjunction with one another — as both were added as a single amendment in 1972. *See* Federal Coal Mine and Safety Act Amendments, Pub. L. No. 92-303, 86 Stat. 150, 154 (1972).[17]

Similarly, we are unable to divorce the "all relevant evidence" language from the balance of the All Relevant Evidence Provision. After instructing that "all relevant evidence shall be considered," the Provision goes on to list various types of relevant medical evidence contemplated by its mandate, including, inter alia, blood gas studies, electrocardiograms, pulmonary function studies, and physical performance tests. Assessing the Provision in context, we are unable to discern any clear intention on the part of Congress to preclude the Secretary from limiting the quantity of relevant evidence admissible in Black Lung Act proceedings. It seems clear, however, that Congress intended that the ALJs should not rely on a single type of medical evidence — the chest X-ray — in assessing black lung claims.

It is also clear that the 1972 amendments — in addition to adding the Provision to § 923(b) — incorporated the broad rule-making

---

[17]The 1972 amendments instruct, in relevant part, that the "first sentence of section 413(b) of such Act [codified as 30 U.S.C. § 923(b)] is amended by inserting before the period at the end thereof the following:

> but no claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram. In determining the validity of claims under this part, all relevant evidence shall be considered, including, where relevant, medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials."

*See* Federal Coal Mine and Safety Act Amendments, Pub. L. No. 92-303, 86 Stat. 150, 154 (1972).

authority of the Secretary provided for in 42 U.S.C. § 405(a). *See* Federal Coal Mine and Safety Act Amendments, Pub. L. No. 92-303, 86 Stat. 150, 152 (1972). Section 405(a), as part of the Social Security Act, provides the Secretary with "full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions," as well as authority to regulate "the nature and extent of the proofs and evidence and the method of taking and furnishing the same." 42 U.S.C. § 405(a). Our reading of the Provision in context, including the provisions of § 405(a), as incorporated into § 923, strongly mitigates against Elm Grove's contention here. The congressional grant of broad authority to the Secretary — to regulate the extent of proofs and evidence in Black Lung Act proceedings — is simply inconsistent with Elm Grove's contention that all relevant evidence can be submitted, without exception, in such proceedings. As the Director points out in his appellate papers, the Provision "has never been construed to prohibit reasonable regulations that, when applied, resulted in the exclusion of relevant evidence from the record." Fed. Resp't's Br. 13-15. By way of example, 20 C.F.R. § 725.457(a) precludes relevant expert witness testimony unless the proponent thereof has notified the other parties, at least ten days before an ALJ hearing, and § 725.461(b) provides that the unexcused failure of a party to attend an ALJ hearing constitutes a waiver of any right to submit evidence there. In these circumstances, the All Relevant Evidence Provision, assessed in the context of the relevant statutory scheme, does not preclude the promulgation of appropriate regulatory limits on evidence in Black Lung Act proceedings.

D.

1.

Finally, in order to complete our *Chevron* analysis, we must assess *Chevron*'s step two, asking whether the Evidence-Limiting Rules are "based on a permissible construction" of the Black Lung Act and its relevant incorporated statutory provisions. *Chevron*, 467 U.S. at 843. In this analysis, we look to the legislative history of § 923(b), as well as the other relevant provisions of the Black Lung Act, which together spell out the authority of the Secretary to regulate the admission of evidence in Black Lung Act proceedings.

As we have explained, the Secretary has construed the Provision in a manner that does not conflict with the Evidence-Limiting Rules. That is to say, the Secretary has concluded that the Provision is not meant to require the admission of every piece of relevant evidence, but rather that the "all relevant evidence" language is part of a larger statutory mandate to consider all types of relevant medical evidence. To determine whether her construction of this portion of the Act is a permissible one, we look to the legislative history of the 1972 amendments to § 923(b).

In its Summary of Major Provisions of those amendments, the Senate Committee on Labor and Public Welfare described the purpose of the amendments to § 923(b). *See* S. Rep. No. 92-743 (1972) *as reprinted in* 1972 U.S.C.C.A.N. 2305, 2311. After acknowledging that a chest roentgenogram (or chest X-ray) is an imperfect means of diagnosing pneumoconiosis in coal miners, and observing that reliance on chest X-rays alone has likely resulted in the denial of valid black lung claims, the Committee described the relevant amendments to § 923(b) as requiring the Social Security Administration to "use tests other than the X-ray to establish the basis for a judgment that a miner is or is not totally disabled due to pneumoconiosis." *Id.* at 2315. Accordingly, as the Committee indicated, the Provision was not intended to require that any particular quantity of relevant evidence be submitted, but instead that the ALJ receive different types of medical evidence:

> The art of medical diagnosis of coal miners' respiratory impairments is not so precise that a miner's benefit should stand or fall on the basis of a single test. Every available medical tool should be used to assist a miner in successfully pursuing his claim for benefits. This provision seeks to expand the *number of medical tools* available for that purpose.

*Id.* at 2319 (emphasis added).

Our analysis of the All Relevant Evidence Provision and its legislative history is thus consistent with the Secretary's construction of it. Congress intended the Provision to require the Secretary to consider medical evidence outside the historical reliance on chest roentgeno-

grams, and the Provision was not intended as a prohibition on regulations that might limit the admissibility of certain other evidence in Black Lung Act proceedings. Accordingly, we agree with the Secretary's conclusion that

> the historical context of the language demonstrates that it is a statutory exhortion for the agency to explore every avenue which may prove the claimant's entitlement. Given the policy behind the provision, its apparent breadth should not act as a guarantor for the admission of any quantity of evidence an operator might obtain which refutes a claimant's entitlement.

Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 62 Fed. Reg. at 3358-59.

## 2.

We next turn to an analysis of whether the Evidence-Limiting Rules were premised on a permissible construction of the Black Lung Act. In this regard, the Secretary has enumerated several reasons for having promulgated the Evidence-Limiting Rules, including the following: (1) to "reduce the costs associated with [black lung claims]"; (2) "to make more equitable the adjudication of black lung claims"; and (3) "to ensure that eligibility determinations are based on the best quality evidence submitted rather than on the quantity of evidence submitted by each side." Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 62 Fed. Reg. at 3338. And, the Secretary has concluded that the Evidence-Limiting Rules will ensure the "fair, efficient and expeditious adjudication of claims." *Id.* As we have noted, ALJs have always possessed discretion, under the Act, to exclude cumulative evidence from Black Lung Act proceedings, and they are instructed to exclude, as a matter of policy, "irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d). The Evidence-Limiting Rules simply codify an ALJ's broad discretion in this regard, in light of the important considerations identified by the Secretary, based on "more than 20 years of experience in processing and adjudicating black lung benefits claims, and more than thirteen years of experience in adjudicating claims under the current program regulations." Regulations Implementing

the Federal Coal Mine Health and Safety Act of 1969, as Amended, 62 Fed. Reg. at 3356. As the Supreme Court recognized in *Chevron*,

> the principle of deference to administrative interpretations has been consistently followed by this Court whenever the decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulation.

*Chevron*, 467 U.S. at 844. (internal citations and quotation marks omitted).

Finally, the Evidence-Limiting Rules do not arbitrarily or impermissibly limit the admission of medical evidence above the proscribed limits. It is important that, to the contrary, they specifically provide ALJs with the broad discretion to hear and admit additional evidence for "good cause." 20 C.F.R. § 725.456(b)(1). This good cause exception is vital to our analysis here, as it allows an ALJ to retain and exercise discretion to admit relevant evidence beyond the limits spelled out in the Evidence-Limiting Rules. *See National Mining*, 292 F.3d at 874 (concluding that the Evidence-Limiting Rules do not set "inflexible limits" but instead give ALJs discretion to hear additional evidence for good cause).

Accordingly, Elm Grove's challenge to the Evidence-Limiting Rules must be rejected. The Rules are a reasonable and valid exercise of the Secretary's authority to regulate evidentiary development in Black Lung Act proceedings, they are based on a permissible construction of the Act, and they are neither "arbitrary, capricious, [nor] manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.[18]

---

[18]Elm Grove further contends that the second ALJ erred by failing to find its additional exhibits admissible under the "good cause" exception to the Evidence-Limiting Rules. *See* 20 C.F.R. § 725.456(b)(1). Elm Grove raised the good cause exception at the hearing and argued that "[o]ur good cause argument in this case would be that under the Fourth Circuit's Decision in the *Underwood* case, they have deemed that all rel-

IV.

A.

Although we reject Elm Grove's challenge to the validity of the Evidence-Limiting Rules, we agree with its contention, on the Rebuttal Evidence issue, that the second ALJ misapplied one of those Rules, 20 C.F.R. § 725.414(a)(3)(ii), in rejecting part of Elm Grove's rebuttal evidence at Blake's ALJ hearing.[19] As noted earlier, we review de novo "a legal question about the proper standard for the admission of evidence in hearings before the ALJ under the Black Lung Benefits Act," and we review for abuse of discretion "a question

---

evant evidence should be considered and, therefore, the *Underwood* case in this position would triumph over the regulation. Our contention is essentially the regulation is invalid." J.A. 765. This argument was rejected by both the second ALJ and the BRB. Elm Grove restates this contention in its brief on appeal, asserting that the "ALJ also erred in his failure to consider the relevant evidence by essentially determining 'relevancy' fails to meet the good cause standard." Petr.'s Br. 60. If Elm Grove's contention is correct, good cause exists to permit all evidence that is relevant, and the good cause exception found in § 725.456 would render the Evidence-Limiting Rules of § 725.414 meaningless. Deeming the Evidence-Limiting Rules valid, we reject Elm Grove's position on this point. Elm Grove's assertions simply do not demonstrate any particularized showing of good cause, beyond its contention that the Evidence-Limiting Rules are invalid.

Elm Grove also contends that the second ALJ should have examined the additional evidence that it sought to introduce in order to determine if there was good cause and to decide whether it should have been included the evidence in the record for appeal. We are unpersuaded by these contentions. Elm Grove's "good cause" argument was simply a restatement of its contention that it should be allowed to submit all relevant evidence at the hearing.

[19]In order to rebut evidence submitted in support of an opposing party's affirmative case, a claimant and the responsible operator each may submit, inter alia, "no more than one physician's interpretation of each chest X-ray, pulmonary function test, arterial blood gas study, autopsy or biopsy" submitted by the opposing party. § 725.414(a)(2)(ii), (3)(ii)

about the proper application of that standard." *Underwood*, 105 F.3d at 948-49.

In their affirmative submissions at the ALJ hearing, Blake and Elm Grove each submitted two X-ray interpretations: Blake submitted two interpretations of the same X-ray (taken in October 2002), and Elm Grove submitted one interpretation each of two different X-rays (taken in September 2001 and November 2001). In seeking to rebut Elm Grove's X-ray interpretations, Blake submitted two additional interpretations — one reading of the September 2001 X-ray and one of the November 2001 X-ray. Elm Grove then sought to submit two interpretations in rebuttal, i.e., since Blake had submitted two interpretations of the October 2002 X-ray as affirmative evidence, Elm Grove sought to submit two interpretations of that X-ray in response. *See* J.A. 732-34. In ruling on this issue, the second ALJ interpreted § 725.414(a)(3)(ii) of the Evidence-Limiting Rules to mean that, when a party submits two interpretations of the same X-ray as affirmative evidence (as Blake did here), only one interpretation of that X-ray can be submitted on rebuttal. *Id.* at 735-36. The second ALJ thus authorized Elm Grove to submit only one of its two proposed rebuttal interpretations. *Id.*

The Director defended the second ALJ's ruling before the BRB, but he has now reversed course and abandoned the BRB, conceding in this proceeding that the ALJ erred. Fed. Resp't's Br. 5 (noting that "[w]e agree with Employer, however, that the ALJ's misunderstanding of a provision of the regulation resulted in the erroneous exclusion of one of Employer's X-ray interpretations"). Respondent Blake, on the other hand, maintains that the ruling of the second ALJ on the Rebuttal Evidence issue was proper, and that it was consistent with the Evidence-Limiting Rules. He contends that § 725.414(a)(3)(ii) of those Rules limits the rebuttal evidence in this circumstance to a single X-ray interpretation, based on the language that "[t]he responsible operator shall be entitled to submit, in rebuttal . . . no more than one physician's interpretation of each chest X-ray." 20 C.F.R. § 725.414(a)(3)(ii).

Having fully considered this contention, we conclude that § 725.414(a)(3)(ii) of the Evidence-Limiting Rules, and the identical language found in § 725.414(a)(2)(ii) thereof, authorize the submis-

sion of one piece of evidence on rebuttal for each piece of affirmative evidence submitted by the other party. *See* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. at 79922 ("Each party may submit one piece of evidence in rebuttal of each piece of evidence submitted by the opposing party."). As the Director now concedes, "the clear tenor of the rebuttal provision is that a party may submit one piece of rebuttal evidence for each piece of affirmative evidence submitted by the opposing party." Fed. Resp't's Br. 22. Section 725.414(a)(3)(ii) of the Evidence-Limiting Rules, and the corresponding language found in § 725.414(a)(2)(ii) thereof, create a piece-for-piece opportunity for rebuttal, as demonstrated by the phrase "one physician's interpretation of each . . . ." As the Director correctly points out, "the regulation's catch-all provision — dealing with evidence not captured by name — is phrased in terms of a piece-for-piece match: the opposing party 'shall be entitled to submit one physician's assessment *of each piece* of such evidence in rebuttal.'" Fed. Resp't's Br. 22-23 (quoting 20 C.F.R. § 725.414(a)(2)(ii), (a)(3)(ii)).

The BRB has recently interpreted the rebuttal language from §§ 725.414(a)(2)(ii) and (a)(3)(ii) of the Evidence-Limiting Rules to authorize each party to submit one piece of evidence for each affirmative piece of evidence submitted by the opposing party. *See Ward v. Consolidation Coal Co.*, BRB No. 05-0595 BLA (Ben. Rev. Bd. Mar. 28, 2006). Thus, the BRB in *Ward* has, contrary to its position in Blake's case, agreed with the "Director's reasonable interpretation of the regulation," and concluded that:

> Each party submits "chest X-ray interpretations" in its affirmative case. 20 C.F.R. §§ 725.414(a)(2)(i), (a)(3)(i). Consequently, "chest X-ray interpretations" are what each party may rebut under 20 C.F.R. § 725.414(a)(2)(ii), (a)(3)(ii). Therefore, in the case at bar, since claimant submitted two interpretations of the March 5, 2002 X-ray in support of his affirmative case, employer was entitled to submit two interpretations in rebuttal under 20 C.F.R. § 725.414(a)(3)(ii).

*Id.* at 5.

We view the present position of the Director as persuasive and agree with Elm Grove that the second ALJ, at the hearing of June 4,

2003, misapplied § 725.414(a)(3)(ii) of the Evidence-Limiting Rules when he excluded Elm Grove's second interpretation of the October 2002 X-ray. Accordingly, we grant Elm Grove's petition for review and vacate the BRB Decision and Order on this point.

B.

Finally, we examine and dispose of Elm Grove's contention on the Work Product issue, that is, that the ALJs and the BRB erred in ruling that draft reports and attorney-expert communications between Blake's lawyers and their physician-experts were protected under the work product doctrine and thus not discoverable.[20] We apply a de novo review to the legal conclusions made by the ALJs and the BRB in this regard. *See Consol. Coal Co. v. Williams*, 453 F.3d 609, 614 (4th Cir. 2006). We assess for abuse of discretion their application of the legal standard. *Underwood*, 105 F.3d at 948-49.

Respondent Blake submitted medical reports of Drs. Lenkey and Cohen for consideration in connection with this claim. When asked about the content of his report during a pre-hearing deposition, Dr. Lenkey admitted that he had not written "every word" of his report and that Blake's attorneys had provided him with certain documents. J.A. 312. Dr. Cohen also testified by deposition that Blake's counsel had provided him with relevant documents and summaries. In pursuing its contention here, Elm Grove asserts that materials provided by counsel to a testifying expert witness concerning the relevant facts and an expert's opinions and reports are discoverable, and that the ALJs and the BRB erred in denying its motion to compel production of draft reports and attorney-expert communications between Blake's counsel and their experts. This is so, Elm Grove contends, because "[w]hen an attorney interjects him or herself into the process by which a testifying expert forms the opinions to be testified to at hearing, that action affects the weight which the expert's testimony

---

[20]We choose to address this discovery issue because it is likely to arise on remand. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984) (noting, in an appeal from a denial of Social Security disability benefits, that "[s]ince the case must be reconsidered by the Secretary, we do provide some guidance as to a matter very likely to arise at the hearing which will occur").

deserves." Petr.'s Br. 26. In contrast, Blake maintains that the draft reports and attorney-expert communications sought by Elm Grove contain his counsel's theories and mental impressions and are thus protected by the work product doctrine.

In his November 26, 2002 Order denying Elm Grove's motion to compel discovery, the first ALJ ruled that draft reports and attorney-expert communications were not discoverable under the work product doctrine, as articulated in the Rules of Practice and Procedure for Administrative Hearings Before the Office of Administrative Law Judges (the "ALJ Rules of Procedure"). *See* J.A. 657-59. With respect to work product, the ALJ Rules of Procedure provide, in part, that

> [i]n ordering discovery . . . the administrative law judge shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the proceeding.

29 C.F.R. § 18.14(c). This rule of procedure is essentially identical to the work product doctrine set forth in Rule 26(b)(3) of the Federal Rules of Civil Procedure (the "Federal Rules"). Rule 26 was amended in 1993, however, to mandate, inter alia, the disclosure of certain information (even when provided by counsel) considered by testifying experts in forming their opinions. *See, e.g.*, Fed. R. Civ. P. 26(a)(2)(B) (mandating that testifying expert shall provide written report to opposing party which includes "complete statement of all opinions to be expressed and the basis and reasons therefor" as well as "the data or other information considered by the witness in forming the opinions").[21] On the other hand, no corresponding revisions have

---

[21] According to the Advisory Committee notes to the 1993 amendments to Rule 26:

> The [expert] report is to disclose the data and other information considered by the expert and any exhibits or charts that summarize or support the expert's opinions. Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions — whether or not ultimately relied upon by the expert — are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

Fed. R. Civ. P. 26 advisory committee's note.

been made to the ALJ Rules of Procedure.[22]

After ascertaining that 29 C.F.R. § 18.14(c) of the ALJ Rules of Procedure incorporated the work product protections of the Federal Rules, the first ALJ examined the analogous work product discovery decisions under Rule 26 and observed that "the case law in this area is far from clear." J.A. 658. Accordingly, he believed that "this material could be treated as either discoverable, or protected work product." *Id.* Ultimately, however, the first ALJ was "more persuaded by the decisions that protect the communication between a party's attorney and its expert," concluding that the discovery sought would undermine the honest and open communications between lawyers and expert witnesses. *See* J.A. 659. The second ALJ, who conducted the formal hearing on Blake's claim, declined to disturb the first ALJ's ruling on this issue, and the BRB affirmed. *See* J.A. 755, 826-27. There is no indication in the record that either of the ALJs or the BRB made a specific review of the individual documents sought by Elm Grove.

---

[22]As a general proposition, an ALJ is bound by the ALJ Rules of Procedure. *See* 29 C.F.R. § 18.1. Section 18.1 thereof defines the scope of those Rules, and provides, inter alia, that:

> These rules of practice are generally applicable to adjudicatory proceedings before the . . . Department of Labor . . . . To the extent that these rules may be inconsistent with a rule of special application as provided by statute, executive order, or regulation, the latter is controlling. The Rules of Civil Procedure for the District Courts of the United States shall be applied in any situation not provided for or controlled by these rules, or by any statute, executive order or regulation.

*Id.* Although the work product protections in § 18.14(c) apply here, the standard set forth therein is nearly identical to that found in Rule 26(b)(3) of the Federal Rules. Because no BRB decision controls the work product protections that § 18.14(c) affords to draft expert reports or attorney-expert communications, we must assess the relevant case law on the analogous work product protections of Rule 26. *Cf. Johnson v. Royal Coal Co.*, 326 F.3d 421, 427 (4th Cir. 2003) (utilizing decision interpreting "analogous Fed. R. Civ. P. 36" to interpret 29 C.F.R. § 18.20, pertaining to pre-hearing admissions).

As explained below, we are unable, in these circumstances, to agree that Blake's expert witnesses could be properly and fully cross-examined in the absence of the draft reports and attorney-expert communications sought by Elm Grove. As the Supreme Court has cautioned, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (citations omitted). And, as several courts have observed, it is important to the proper cross-examination of an expert witness that the adverse party be aware of the facts underlying the expert's opinions, including whether the expert made an independent evaluation of those facts, or whether he instead adopted the opinions of the lawyers that retained him.[23] *See, e.g.*, *Musselman v. Phillips*, 176 F.R.D. 194, 200 (D. Md. 1997) ("It cannot seriously be denied that the fact that an attorney has interjected him or herself into the process by which a testifying expert forms the opinions to be testified to at trial affects the weight which the expert's testimony deserves."); *Karn v. Rand*, 168 F.R.D. 633, 639 (N.D. Ind. 1996) ("[T]he impact of expert witnesses on modern-day litigation cannot be overstated; yet, to some, they are nothing more than willing musical instruments upon which manipulative counsel can play whatever tune desired. . . . Thus, full, effective cross examination is critical to the integrity of the truth-finding process." (citations omitted)); *Occulto v. Adamar of New Jersey, Inc.*, 125 F.R.D. 611, 615-16 (D.N.J. 1989) (noting that the "weight accorded to an expert's opinion must vary in accordance with the expert's competence and knowledge; an expert who can be shown to have adopted the attorney's opinion as his own stands less tall . . . than an expert who has engaged in painstaking inquiry and analysis before arriving at an opinion").

---

[23]The fact that a lawyer has participated in the preparation of his testifying expert's report does not bar the use of the expert's opinion, or necessarily even impeach the expert's reliability. Such participation does, however, potentially impact on the weight to be accorded such opinion evidence. For example, the lawyer could have participated merely as the expert's scrivener, assisting in the report preparation process only, and not directing the witness to emphasize any specific facts or reach any particular opinions. The interplay between testifying experts and the lawyers who retained them should, however, be fair game for cross-examination.

Although our Court has not definitively addressed this precise issue, other courts, under both pre- and post-amendment Rule 26, have mandated the production of similar draft reports and attorney-expert communications with respect to testifying experts. *See, e.g.*, *In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375-76 (Fed. Cir. 2001) (concluding that documents and information provided to testifying expert in connection with opinions and testimony are discoverable by opposing party, whether or not expert relies on the documents in preparing expert report); *Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 387-88 (N.D. Cal. 1991) (holding that absent extraordinary showing of unfairness beyond interests generally protected by work product doctrine, communications from lawyer to expert related to subject of expert's testimony are discoverable, even if otherwise considered opinion work product); *Occulto*, 125 F.R.D. at 616-17 (concluding, where evidence indicated that plaintiffs's counsel had drafted expert report, that draft reports and correspondence between counsel and testifying expert were discoverable, and noting that it "does not serve the truth-finding process to preclude meaningful inquiry" into the derivation of expert's opinion); *Boring v. Keller*, 97 F.R.D. 404, 407 (D. Colo. 1983) (concluding that "the opinion work product rule is no exception to discovery under circumstances where documents which contain mental impressions are examined and reviewed by expert witnesses before their expert opinions are formed").[24]

---

[24]We recognize that certain courts, both before and after the 1993 amendments to Rule 26, have determined that draft reports provided to testifying experts and attorney-expert communications are entitled to varying degrees of work product protection. *See, e.g.*, *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587 (3d Cir. 1984) (discussing, prior to Rule 26 amendments, relationship between paragraphs (3) and (4) of Rule 26(b)and concluding opinion work product is entitled to protection even when it has been disclosed to testifying expert); *Nexxus Products Co. v. CVS New York, Inc.*, 188 F.R.D. 7, 10-11 (D. Mass. 1999) (stating that continued protection of core work product allows unconstrained communications between expert and attorney and better serves ultimate truth-seeking function of trial process). We are unpersuaded by this line of decisions and, as discussed herein, believe that the vastly superior view is, consistent with the 1993 amendments to Rule 26, that such attorney-expert communications are not entitled to protection under the work product doctrine.

The first ALJ properly observed, in ruling on this issue, that, "as the trier of fact, seeking the truth is a vital function." J.A. 659. Here, Drs. Lenkey and Cohen both acknowledge that Blake's lawyer provided them with factual summaries and documents, and that he may have contributed to the substance of their expert reports. Accordingly, the disclosure to Elm Grove of the pertinent draft reports and attorney-expert communications was potentially important to a full and fair cross-examination and to the truth-seeking process. It is also apparent that the discovery of such materials by Elm Grove will not undermine any settled policies underlying the work product doctrine. Attorney work product, and especially opinion work product, is still protected from discovery, in order that a party may not advance its case on "wits borrowed from the adversary." *Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring). We have recognized that the work product doctrine ensures that lawyers do not lose their "incentive to do thorough research, relying instead on the opposing party's effort." *In re Allen*, 106 F.3d 582, 607 (4th Cir. 1997). Attorney work product also enjoys protected status so as to allow the parties to litigation "privacy in the development of legal theories, opinions and strategies for the client." *National Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 983 (4th Cir. 1992). As the *Musselman* decision of the District of Maryland observed, however, "this interest is hardly served when the attorney discloses [his legal theories and opinions] to a retained expert in order to shape opinion testimony to be offered at trial." *Musselman*, 176 F.R.D. at 201. Here, Elm Grove sought discovery of draft reports and attorney-expert communications in seeking to determine which portions of the expert reports, if any, had been prepared by counsel, or with the assistance of counsel, and to assess and ascertain which portions thereof resulted from the experts' independent efforts. Rather than seeking to benefit from its opposing counsel's work product, Elm Grove was seeking these materials for an entirely legitimate purpose — to fully explore the trustworthiness and reliability of Drs. Lenkey and Cohen. In sum, draft expert reports prepared by counsel and provided to testifying experts, and attorney-expert communications that explain the lawyer's concept of the underlying facts, or his view of the opinions expected from such experts, are not entitled to protection under the work product doctrine.[25] *See In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d at 1375-

---

[25]We observe that, in connection with discovery issues such as those presented here, it is important to distinguish between testifying experts,

76 (concluding that "because any disclosure to a testifying expert in connection with his testimony assumes that privileged or protected material will be made public, there is a waiver to the same extent as with any other disclosure." (citations omitted)).

In the context of the foregoing principles, the ALJs and the BRB thus abused their discretion in categorically denying Elm Grove's motion to compel on the mistaken belief that the documents were protected work product, and in failing to specifically examine and assess the documents being sought by Elm Grove. As a result, we also vacate the BRB Decision and Order on the Work Product issue and remand for the ALJ to appropriately examine and rule on the documents sought by Elm Grove, in light of the principles discussed herein.

V.

Pursuant to the foregoing, we deny Elm Grove's petition for review on the Evidence-Limiting Rules issue. We grant its petition on the Rebuttal Evidence and Work Product issues, vacate the BRB Decision and Order, and remand for such further proceedings as may be appropriate.

*PETITION FOR REVIEW GRANTED IN PART;*
*DECISION AND ORDER VACATED AND REMANDED*

---

on the one hand, and non-testifying or consulting experts, on the other. Any such draft reports or attorney communications made or provided to non-testifying or consulting experts should be entitled to protection under the work product doctrine.